**BONHAM v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 10770.**

Circuit Court of Appeals, Eighth Circuit.

April 5, 1937.

Peter S. Rask, of Minneapolis, Minn. (P. J. Coffey, of Minneapolis, Minn., and Mullen & Shea, of Washington, D. C., on the brief), for petitioner.

Warren F. Wattles, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., Sewall Key and Helen R. Carloss, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before STONE, GARDNER, and WOODROUGH, Circuit Judges.

STONE, Circuit Judge.

This is a petition by a taxpayer to review an order of the Board of Tax Appeals sustaining an additional income tax for the year 1929. The tax arose from a profit on an exchange of stock of the First National Bank of Fairbury for cash and stock of the Northwest Bancorporation, which occurred in 1929.

Various issues were determined by the Board, of which only two are presented by this petition to review. The first of these is the inclusion by the Commissioner, as part of the transaction realized in 1929 to the petitioner, of 750 shares of the Northwest Bancorporation which were held by it to guarantee a part of the contract. The second is the proper base value for a portion of the First National Bank stock. To understand and determine these issues it is necessary to outline the transaction.

### The 750 Shares.

As to the issue concerning the 750 shares, the statement following. In 1929, petitioner and his wife were owners of 750 shares of the stock of the First National which they had acquired in varying amounts and at various times theretofore, some by inheritance and others at various prices. In October, 1929, a contract was executed between petitioner, and his wife on one side and the Northwest on the other. The contract designates the former as "stockholders" and the latter as the "Company." The contract set out that each of such stockholders agreed to exchange his stock "for four (4) shares of stock of the Company or Three Hundred Sixty Dollars ($360.00) in cash * * * provided, however, that no Shareholder shall be entitled to receive from the Company more than one-fourth of the total purchase or sales price in cash but shall in each instance accept at least three-fourths of the consideration in stock of the Company." The contract further set forth that the Company had caused to be made an examination of the "assets and affairs" of the First National and had objected to certain assets described in Exhibits A and B attached to the contract. As to the objectionable assets in Exhibit B the contract provided as follows:

"The Shareholders further agree that they will see that the conditions to be complied with, in connection with the assets

described in Exhibit 'B' hereto attached, will be fulfilled in the manner and at the times stated in said Exhibit 'B'. As a guarantee for the performance of the covenants of this paragraph of the contract, the Shareholders agree that they will deposit with the Company Seven Hundred Fifty (750) Shares of stock of the Company which they are to receive under the terms of this agreement, to be held by the Company until all the requirements of said Exhibit 'B' have been fulfilled and that, in the event of the failure of the Shareholders to comply with any of said requirements, the Company may sell said stock, or so much thereof as is necessary, on the market without notice to the Shareholders and use the proceeds to reimburse the Bank for any loss resulting to the Bank by reason of the failure of the Shareholders to fulfill such requirements."

Exhibit B listed nine separate loans (totaling $84,423) as to each of which there was an expressed "condition to be complied with"—such "condition" relating to payment or security.

In compliance with the contract, petitioner and his wife conveyed to the Northwest the 750 shares in the First National owned by himself and wife—they electing to take one-fourth of the payment in cash. The Northwest paid the cash ($67,500) and issued and delivered to him and his wife 1,500 shares in the Northwest. The remaining 750 shares were issued to him on the books of the Northwest, but were retained by it under the guarantee in the contract concerning Exhibit B. Of this retained stock, 250 shares were delivered to petitioner in 1931 and the remaining 500 shares in 1932, the conditions of the contract as to Exhibit B having then been performed.

In the above situation, petitioner contends that the 750 shares of Northwest were retained and not delivered to him until in 1931 and 1932 and, therefore, should not be included in computing his taxable income for the year 1929. The supporting argument is expressed in the brief as follows:

"Considering the contract alone, it might be argued that petitioner was entitled to receive the remaining 750 shares of his consideration, and that he then must deposit these 750 shares with the Northwest Bancorporation in compliance with his guarantee. However, the facts indisputably show that the petitioner did not receive the 750 shares of Bancorporation stock, and we believe that the facts clearly show that there was no intention to deliver the said 750 shares of stock to the petitioner until the conditions were fulfilled. Taking into consideration the testimony and the contract, it is indisputable that 750 shares of the consideration were not delivered, but were withheld by the Northwest Bancorporation, and that they would only be delivered when the conditions precedent, outlined in schedule B of Petitioner's Exhibit One, were fulfilled."

This contention must be resolved by what was done in accordance with the requirements of the contract of exchange. The requirements of the contract define the relation and status of petitioner in this respect and govern. Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 373, 56 S. Ct. 285, 287, 80 L.Ed. 278; Wholesalers Adjustment Co. v. Commissioner, 88 F.(2d) 156 (C.C.A.8); Commissioner v. Vandegrift Realty & Investment Co., 82 F.(2d) 387, 390 (C.C.A.9). The provision of the contract here vital is as follows: "As a guarantee for the performance of the covenants of this paragraph of the contract, the Shareholders agree that they will deposit with the Company Seven Hundred Fifty (750) shares of stock of the Company which they are to receive under the terms of this agreement, to be held by the Company until all the requirements of said Exhibit 'B' have been fulfilled and that, in the event of the failure of the Shareholders to comply with any of said requirements, the Company may sell said stock, or so much thereof as is necessary, on the market without notice to the Shareholders and use the proceeds to reimburse the Bank for any loss resulting to the Bank by reason of the failure of the Shareholders to fulfill such requirements."

This provision required the issue of 750 shares of the Northwest stock; the "deposit" thereof with that company until fulfillment of the conditions of Exhibit B; and the right to "sell * * * on the market" such stock or parts thereof as necessary to make good default in such fulfillment. Such requirements are consistent only with the passing of title to the stock and its pledge as guarantee of fulfillment of the conditions of Exhibit B. The stock was issued, the title passed then to petitioner, and the stock was retained as a pledge. The circumstance is unimportant that the stock was not physically

delivered to petitioner and then redelivered by him to the company upon the pledge. In so far as strict legal right under the contract is concerned, he might have demanded such delivery and have made such redelivery. The actual handling through issuance and retention on the pledge was merely a matter of convenience not of legal right. "It is the fixation of the rights of the parties that is controlling." Commissioner v. Cleveland Trinidad Paving Co., 62 F.(2d) 85 (C.C.A.6); Commissioner v. R. J. Darnell, Inc., 60 F.(2d) 82, 84 (C.C.A.6).

The parties might possibly have contracted in a way which would have kept title to the 750 shares in the Northwest so that this part of the exchange price would have remained contingent. This might have brought the arrangement within the citations [1] relied on by petitioner wherein there was no passing of title. But that was not done and "to determine what the respondent [here petitioner] got, we are to consider what it did, and not what it could have had if it had made another choice." U. S. v. Safety Car Heating & Lighting Co., 297 U.S. 88, 98, 56 S.Ct. 353, 358, 80 L.Ed. 500. The net final effect upon the parties would have been the same whichever of the two ways might have been taken and taxation is concerned with effects. However, where the choice of ways makes a difference in application and effect of the tax statutes, the taxpayer must be held to the way and status he voluntarily created as is likewise the government.

Since the title to these 750 shares passed in 1929, they were properly included in estimating the gain in that year from this exchange.

### Base Value of Stock.

Included in the 750 shares of First National stock held by petitioner and his wife in 1929 and exchanged by them were 520 shares inherited by petitioner on the death of his father on January 29, 1920. It is the base value of this inherited stock which is in dispute.

There is no difference as to the matter that the value to be ascertained is as of January 29, 1920. The contest is over what the evidence showed to be the value as of that date. The Board found this value to be $175 a share. Petitioner contends that this value, as shown by the evidence, was $279.64 a share. In his petition to the Board he claimed a value of $260, which was amended at the close of the testimony.

Generally stated, the evidence was of the character following: Statements (made up from the bank books) showing financial condition of the First National at the close of the years 1914 to 1929 (both inclusive); statement showing earnings and dividends for the years 1915 to 1929 (both inclusive); testimony of petitioner as to book value of capital stock on January 29, 1920; testimony of petitioner as to two nonledger assets (real estate $45,000 and accrued interest $31,575); opinion testimony as to value of stock; and testimony as to sales of stock. This evidence presented several different methods of arriving at the stock value. [2]

[1] Stoner v. Commissioner, 79 F.(2d) 75 (C.C.A. 3), certiorari denied Helvering v. Stoner, 296 U.S. 650, 56 S.Ct. 309, 80 L. Ed. 462; North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197; Commissioner v. Cleveland Trinidad Paving Co., 62 F. (2d) 85 (C.C.A. 6); Commissioner v. R. J. Darnell, Inc., 60 F.(2d) 82 (C.C.A. 6); Big Lake Oil Co. v. Commissioner, 34 B.T.A. 1003; Bassett v. Commissioner, 33 B.T.A. 182. To which may be added U. S. v. Safety Car Heating & Lighting Co., 297 U.S. 88, 56 S.Ct. 353, 80 L.Ed. 500, Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010, and Commissioner v. Turney, 82 F.(2d) 661, 662 (C.C.A. 5). Cases more like the one before us are Blum v. Helvering, 64 App.D.C. 78, 74 F.(2d) 482, certiorari denied 295 U.S. 732, 55 S.Ct. 643, 79 L.Ed. 1681, and Fawsett v. Commissioner, 63 F.(2d) 445 (C.C.A. 7), certiorari denied 290 U.S. 641, 54 S.Ct. 59, 78 L.Ed. 556.

[2] The financial statements showed a gradual healthy growth in volume of business fairly consistent during the above years. For the end of 1919 (nearest January 29, 1920), the statement showed assets of $1,098,686.77 with liabilities (excluding capital stock), consisting of circulation notes, due to other banks and deposits, of $951,597.59. It showed a surplus of $20,000 maintained from 1914 through 1919 and undivided profits of $17,089.18. The capital of the bank was $100,000 with par value of $100 per share. This excess of assets over the above liabilities when added to surplus and undivided profits is $174,178.36 which gives a book value per share on $100,000 capital of $174.18.

The Board considered all of this evidence and determined a value of $175 a share. Petitioner asserts that this result is based alone upon the evidence as to sales prices and contends: (1) That these were not free market sales and, therefore, not a fair criterion of value; (2) that the Board did not consider the non-ledger assets and good will; and (3) that the Board "arbitrarily" declined to consider the opinion evidence.

There is no basis for the statement that the Board based its conclusion solely upon the sale prices except the circumstance that all of the sales, except the first and second, were at that price. The opinion of the Board reveals a consideration of all of the evidence.[3] Therefore, it is un-

The statement of earnings and dividends will be viewed from the standpoint of a possible purchaser on January 29, 1920. He would have found net yearly earnings for 1915 to 1919 (both inclusive) as follows: $9,429.26, $11,919.79, $5,643.-80, $8,094.31, and $10,971.65—an average annual earnings over five years of $9,-211.76. Dividends for the same years were $12,000, $8,000, $4,150, $13,000, and $8,000—an average yearly dividend of $9,030 for the five years.

The testimony of petitioner as to book value of stock on January 29, 1920, was as follows: capital $100,000, surplus $20,000, undivided profits $3,089.18 and earnings $4,970.18—a total of $128,059.-36. This would give an apparent book value at that time of about $128 a share.

The testimony as to nonledger assets was that these were $45,000 real estate and $31,575 accrued interest as of January 29, 1920. It is not clear that this real estate is not covered in the book statement of assets, etc., since there is therein an item of $40,000 for "Banking House and Fixtures." On these statements appears another item "Other Real Estate" showing $2,800 for 1914, 1915, $3,000 for 1916 and nothing for any subsequent year except 1925, when it appears as $7,000. As to the accrued interest, it may be said that the bank does not seem to have kept its books on the accrual basis so that this item would not appear on the books and from there to the above statements. Also, it would seem that, as of January 29, 1920, the item "earnings $4,970.18" was intended to cover all realized earnings between January 1 and 29, 1920.

Opinion testimony as to value of this stock was by the petitioner and witnesses Albrecht, Highland, Goethe, and Changstrom. The "actual market value" of $300 per share testified by petitioner was apparently influenced by the advantage of having a controlling interest in the bank which enabled him to fix his own salary and gave him an insight into the affairs of the community enabling him "to make trades." Mr. Albrecht testified purely as an opinion witness. He estimated a value of $260. An important element in his estimate was purchase of the control.

The testimony of Mr. Highland, who was interested in the purchase of this stock by the Northwest, is contradictory. In one place he states the stock would be worth "a premium of at least $50.00 a share. I have paid a hundred dollars a share premium for a bank that didn't have any better earning power than this bank here, or any greater opportunity." In another place he estimates $265 as reasonable. Mr. Goethe, a bank stock broker, estimated $280. Mr. Changstrom knew of this bank and thought quite highly of it and its prospects. His estimate was $260.

The testimony as to sales of stock related to stock bought or sold by petitioner. It showed purchases as follows:

September 30, 1912, 10 shares at..$100.
December 2, 1912, 40 shares at..$160.
September 1, 1920, 173 shares at..$175.
September 10, 1920, 33 shares at..$175.
January 27, 1921, 12 shares at..$175.
July 5, 1921, 5 shares at..$175.
April 22, 1922, 3 shares at..$175.
December 2, 1923, 4 shares at..$175.

There was one sale, in April, 1920, to petitioner's mother of 50 shares at either $148 or $175, the record is not quite clear as to which price, but the Board found it to be $175.

[3] In the opinion is the following:
"In support of his contention that the fair market value of the bank stock on January 29, 1920, was $279.64 per share, the petitioner submitted statements made up from the books showing the financial condition of the bank at the close of each year from 1915 to 1929, inclusive, and earnings and dividends for the same period, also the opinions of several witnesses of value for the stock ranging between $250 and $270 per share. Other testimony reflected a book value for the capital stock on January 29, 1920, of $128,059.36, or approximately $128 per share. In addition, the petitioner testified to nonledger assets of $45,000, representing real estate and net accrued interest receivable of $31,575, thereby arriving at a claimed value for the assets of the bank in the amount of $204,635.36. The opinions of the petitioner's witnesses were based on the assumed correctness of these figures.

necessary to determine whether these sales prices were unduly low, as contended by petitioner in the evidence and here, or not. Also, it is clear that the Board did not "arbitrarily" or otherwise give no consideration to the opinion evidence.

The only contention meriting examination is whether the Board gave no consideration to nonledger assets and good will. While petitioner asserts that good will was not considered by the Board, there is no definite argument as to what effect good will should have had or how it was to be valued or estimated as an element of value. The real contention has to do with the claimed failure of the Board to consider the nonledger items. The opinion of the Board (quoted in footnote 3) shows the Board did consider both of these items, to wit, real estate and accrued interest. The real difficulty arises out of what petitioner deems the mistake of the Board in its view as to the accrued interest. In the original opinion the Board criticized the claim of $31,575 as accrued interest as of January 29, 1920. Part of this criticism was based on the statement that the total loans of the bank amounted to $96,519. The record so showed but petitioner claimed the reporter had erroneously put that figure when peti-

tioner had testified the loans were $967,-519.19. The petitioner filed a motion to correct this figure. This motion was denied because petitioner failed to appear and offer proof of the claimed mistake, the Board saying:

"There was no appearance for the petitioner and no proof of the facts alleged in the motion was offered. By reason of this failure to submit proof and for the further reason that a change of the one item sought by this motion when considered in connection with other evidence of record would not result in any change in the decision herein, it is

"Ordered, That the motion be and hereby is denied."

We must accept the record as it comes to us. This is accented in view of petitioner's failure to support the motion to correct the record.

■ . It would not seem that either of the nonledger items is properly to be considered in the connection it was sought to be used. That connection is the evidence of petitioner as to the value of the shares as measured by the unimpaired capital plus surplus, undivided profits and earnings—all as of January 29, 1920. In such a meas-

---

"A substantial item in the total value claimed for the assets of the bank is the amount of $31,575, representing net accrued interest receivable. The explanation offered as to this item was that the total loans of the bank amounted to $96,-519 on notes running from 6 to 12 months with interest at rates from 8 to 10 per cent. and further that the bank had warrants in the amount of $63,901, drawing interest at the rate of 7 per cent. It is interesting to note that interest on the full amount of the loans for a full year at 10 per cent. amounts to only $9,651.90 and one year's interest on the warrants to $4,473.07. It is also noted that earnings for the year 1919 from all sources amounted to only $10,971.65 and for the entire year 1920, to $15,016.50, and that the book value previously stated, of $128,-059.36, included earnings, which apparently were for the period from January 1 to January 29, 1920, in the amount of $4,970.18.

"After considering all of the evidence before us, we have decided and have found as a fact that the fair market value of the bank stock on January 29, 1920, was $175 per share."

A portion of this opinion was later amended to read as follows:

"The petitioner contends that the stock

had a fair market value of $279.64 on that date, while the respondent takes the position that the fair market value of the stock was $175 per share, as reflected by sales made soon thereafter and over a period of several years.

"The petitioner claims that the fair market value of the bank assets on the date in question was $204,635.36, or approximately $204 for each share of stock outstanding and relies on the testimony of several witnesses, called in his behalf, who were of the opinion that the fair market value of the stock was between $250 and $270 per share. On the other hand it is noted that the book value of the capital stock on January 29, 1920 was only $128,059.36, or approximately $128 per share. Further, it appears, from the statement of earnings and dividends introduced in evidence by the petitioner, that net earnings adjusted to reflect losses on loans and bonds, and all recoveries for the years 1915 to 1920, inclusive, were $9,429.26, $11,919.79, $5,643.80, $8,094.-31, $10,971.65 and $15,016.50, respectively, and that the net earnings so adjusted did not again reach the high of 1920 until the year 1928. It is also noted that all sales or purchases of the stock in 1920, or near that time, were made at $175 per share."

urement, an asset of the bank (such as real estate) had no place. Nor had accrued interest unless there was evidence, which there was not, that this accrued interest was clear profit above all liabilities and expenses as of that date. Even if both of these items had been included, the result would have been a share value of about $204.

 Because petitioner has so vigorously pressed this issue as to the base value of this stock, we have given it far more attention than it deserved. The short answer to this entire contention is that the different sorts of evidence of such value placed it variously at $128, $174.18, $175, $204, $260, $265, $280, and $300; that the evidence was conflicting; that the figure ($175) found by the Board is supported by substantial evidence and that a finding of fact by the Board supported by substantial evidence is conclusive upon this court.

The order of the Board is affirmed.