## CHAPLIN v. COMMISSIONER OF INTERNAL REVENUE.

## COMMISSIONER OF INTERNAL REVENUE v. CHAPLIN.

### No. 10245.

Circuit Court of Appeals, Ninth Circuit.

May 24, 1943.

Loyd Wright, Charles E. Millikan, and Herschel B. Green, all of Los Angeles, Cal., for Charles Chaplin.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Helen R. Carloss, Bernard Chertcoff, and Alvin J. Rockwell, Sp. Assts. to the Atty. Gen., for the Commissioner.

Before DENMAN and MATHEWS, Circuit Judges.

**DENMAN, Circuit Judge.**

Charles Chaplin and the Commissioner of Internal Revenue each present a petition for review of the determination of Chaplin's income tax liability for the calendar year 1935 by the Board of Tax Appeals, now named Tax Court of the United States, and hereinafter called the Tax Court.

The Tax Court decided that certain shares of stock in United Artists Corporation, a Delaware corporation, hereinafter called United, of which the stock certificates were delivered to Chaplin in 1935, were acquired by him in 1935 as consideration for his performance of his agreements of a contract with United and that their value should be added as ordinary income to his gross income. It upheld a deficiency assessed against him for his failure so to return his income for that year. Chaplin contends that he acquired the stock in prior tax years and hence is not liable for the deficiency.

The Tax Court also decided that certain cash received by Chaplin in 1935, but in prior years declared by United as dividends on the stock, and paid over to an escrow holder, were dividends received by Chaplin in 1935 and should be deducted from his income for that year in computing his normal tax. 1934 Revenue Act § 25(a), 26 U.S.C.A. Int.Rev.Acts, page 676. Chaplin had included this money as dividends in his return for 1935, but claimed he erred in that he had received them in the prior tax years in which they had been declared. The Commissioner contends that this money was ordinary income and hence not deductible in computing Chaplin's normal tax for 1935.

A. *Chaplin's shares in United Artists Corporation.* In the year 1935, Chaplin received from one Dennis Francis O'Brien, escrow agent under a contract of Chaplin and others with United, two certificates of stock of that corporation. They were for 167 shares each and were dated October 31, 1928, when they were received by Chaplin, endorsed in blank by him, and given to O'Brien, who held them until 1935. Chaplin, claiming that the certificates were mere indicia of his prior ownership of the stock which he acquired in tax years before 1935, did not include value of the stock in his gross income for that year.

The Commissioner held that Chaplin acquired ownership of the 334 shares as well

as possession of the certificates in 1935, and that their fair market value, which he determined at $104,709, should be included in his 1935 gross income under § 22(a) of the Revenue Act of 1934, c. 277, 48 Stat. 680, 26 U.S.C.A. Int.Rev.Acts, page 669.[1] Chaplin petitioned the Tax Court, which sustained the Commissioner.

United's issuance of the certificates in Chaplin's name in 1928 was the outcome of his dealings, beginning in 1919, with United, David Wark Griffith, a motion picture producer, Mary Pickford and Douglas Fairbanks. It was the latter three, with Chaplin, who caused the incorporation of United. These dealings continued until 1924, when a contract was made amending prior agreements with all these.parties.

The question here is whether Chaplin owned the shares, at least as early as in 1928, when he received and endorsed in blank the certificates issued in his name, and turned them over to O'Brien.

There was an agreement in 1919, thereafter twice amended, between these four and United whereby Chaplin, Pickford and Fairbanks each were to cause to be produced photoplays, in which each appeared as a performer, and to deliver them to United. Each was to receive 1000 shares of United common stock as a consideration for contracting to deliver the plays. Stock certificates aggregating 1000 shares for each actor-producer, dated June 9, 1919, were given by United to O'Brien as escrow holder. O'Brien was to deliver a certificate for a certain number of shares to each actor-producer upon delivery to United of one of his or her photoplays.

United's books for 1919 show 1000 shares of common stock outstanding in Chaplin and in each of the three others. In United's original 1919 entry these 4,000 shares are charged in its capital account as "issued." Its capital account continued in this form until after the tax year in question. At a meeting of the stockholders on September 9, 1919, they confirmed a resolution of the board of directors that the escrow agreement should provide "for the holding and delivery of said four thousand (4,000) shares of non-par value in accordance with the terms and provisions of said contracts between said Charles Chaplin, Douglas Fairbanks, David W. Griffith and Gladys Mary Moore (professionally known as Mary Pickford) and this Corporation dated February 15th, 1919, said escrow agreement to provide that while said four thousand (4,000) shares are held in escrow, each of the aforesaid artists shall have the right to vote *his or her respective holdings thereof*; * * *." (Emphasis supplied.) Chaplin and the others exercised that voting right in many of the stockholders' meetings from 1919 on. As stockholder Chaplin entered into contracts with United and the other stockholders modifying their prior contracts.

United's annual statements from 1919 to 1935 show 1000 shares of common outstanding in Chaplin's name. As admitted by the Commissioner, dividends were declared by United on the 1000 shares so standing in his name in the years 1930 to 1934. These dividends, as admitted in the Commissioner's answer in the Tax Court proceeding, "were paid to the escrow agent," O'Brien.

In the escrow agreement for the holding of the certificates, they are. described as "First: The Corporation shall forthwith deliver to, and deposit with, the Depositary the nine (9) stock certificates, representing in the aggregate one thousand (1000) shares of the common stock of the Corporation, *which have been issued* in the name of the Artist as aforesaid." (Emphasis supplied.)

The artists' 1919 agreement to supply the photoplays was to be performed in three years, at the end of which time any certificates not delivered to them were to be delivered to United. None performed his agreement in full at that time. Chaplin had delivered but one play and received a certificate for 111 shares. The time limit was waived by United and an amended agreement made by all the artists and the corporation on November 22, 1924. O'Brien then held in escrow eight certificates for a total of 889 shares, described

---

[1] "Sec. 22. Gross Income

"(a) General Definition. 'Gross Income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever."

by the corporation as for stock "issued" in Chaplin's name.

■ As stated in an opinion of the Second Circuit determining the incidence of a tax on income, "It is elementary that title passes when the parties intend that it shall pass and such intention is to be gathered from the contract and conduct of the parties. Uniform Sales Act, § 18; Williston, Sales, § 260 et seq." Barde Steel Products Corp. v. Commissioner, 40 F.2d 412, 414.

The 1924 agreement includes a statement of facts upon which its covenants are predicated. These facts, therefore, must be imported so far as relevant into each covenant. The agreement regarding Chaplin's ownership of the "issued" stock is "The parties herein contracting do so with reference to the following facts: * * * Miss Pickford, Chaplin, Fairbanks and Griffith are the owners of all of the preferred and common stock of the corporation, now issued and outstanding, other than certain qualifying shares issued to directors. * * *."

The pertinent covenant into which these facts are imported is

"Article III

"Section 1. Chaplin and the corporation agree to, and do hereby modify the Chaplin distribution agreement so that Chaplin shall be obligated to deliver to the corporation for distribution only five (5) additional motion picture photoplays, described in the original contract instead of the eight (8) undelivered pictures provided for in said contract. The balance of the common stock of the corporation, which is now held in escrow for the benefit of Chaplin, shall be delivered to him in the proportion of one-fifth (⅕) thereof upon delivery of each motion picture photoplay by Chaplin to the corporation, as in said contract provided. * * *."

That is to say, the balance of the common stock "which is now held in escrow for the benefit of Chaplin" was then held for him as its "owner."[2]

Subsequent to this recognition of his ownership of the shares, Chaplin produced and delivered to United two more photoplays, one in 1925 and one in January 1928. He received no certificates for these until November 8, 1928. On October 31, 1928, he transferred to United the certificate for 111 common shares which he had previously received for his first photoplay, and O'Brien transferred to United the Chaplin certificates for the 889 shares. For these 1000 shares surrendered, six certificates in Chaplin's name and dated October 31, 1928, were issued: No. 83 for 166 shares; No. 84 for 167 shares; No. 85 for 166 shares; No. 86 for 167 shares; No. 87 for 167 shares; and No. 88 for 167 shares, a total of 1000 shares. Chaplin received and endorsed these certificates in blank for transfer, and they were held in escrow by O'Brien, thus showing by "the conduct of the parties," Chaplin's ownership of the shares.

On November 8, 1928, Chaplin received from O'Brien the first three of these certificates for the three photoplays he then had delivered. He produced and delivered one more play prior to 1935, for which he received one certificate.

All Chaplin's photoplays were longer than the 3,000 feet reels agreed upon as a maximum, and no further photoplays were required from him by United. It agreed with Chaplin on September 20, 1935, to cause the last two certificates held by O'Brien to be delivered to him with the dividends accumulated thereon for the years 1930 to 1934, inclusive. Pursuant to this agreement Chaplin received the certificates and dividends.

The 1935 agreement is an express amendment of the 1924 contract with respect to deliveries of the plays, in which it was agreed that Chaplin owned the common shares.

■ The Commissioner would have us treat the 1924 agreement as to the ownership of the shares as containing a mere recital of ownership not contractual in nature. With this we cannot agree. Chaplin's ownership attaches to the covenant concerning their character. All the significant corporate acts respecting the shares, which the escrow agreement describes as

---

[2] In none of the cases cited by the Commissioner was there such an express agreement that the certificates in the possession of escrow agents were owned by those claiming such ownership. Olson v. Commissioner, 24 B.T.A. 702, affirmed, 7 Cir., 67 F.2d 726, certiorari denied 292 U.S. 637, 54 S.Ct. 716, 78 L.Ed. 1489; Stiver v. Commissioner, 8 Cir., 90 F.2d 505; Big Lake Oil Co. v. Commissioner, 3 Cir., 95 F.2d 573, certiorari denied 307 U.S. 638, 59 S.Ct. 1037, 83 L. Ed. 1520; Silberblatt v. Commissioner, 28 B.T.A. 73.

302

*then* "issued," are consistent with their issue and not consistent with a mere preparation for an issue to be made by O'Brien as a mere issuing agent for United. They had been issued to Chaplin when O'Brien received them. From the first corporate entry they were treated as issued and so charged in United's capital account. Dividends were declared on them. Directors have no power to declare dividends on stock which has not been issued.

■ The Commissioner contends that there was no declaration and no payment of dividends because, he claims, there was no stock issued upon which they could be declared. As seen, this contention respecting the dividends is not maintainable, for in the Commissioner's answer to Chaplin's petition to the Tax Court he ad.nitted the payment of the dividends on the stock. Dividends cannot be paid by a corporation to itself. The dividends could only be paid to another person.

The shares must have been issued when O'Brien received them or Chaplin would have nothing to vote in the many stockholders meetings prior and subsequent to 1924, in which the records show he constituted a member as a holder of 1000 shares and so voted them.

Notwithstanding his admission that stock had been issued upon which dividends had in fact been paid, the 1924 agreement of all the parties of Chaplin's ownership and his receipt and endorsement of the certificates in 1928, the Commissioner would have us construe the *prior* agreements so amended in 1924 and conclude that the provisions for the escrow of the stock contemplated that Chaplin's certificates did not represent ownership in him when held by O'Brien, and that his ownership was not to commence until delivery of the certificates. In effect, the Commissioner's position is that the transaction agreed upon was for a mere sale or exchange in 1935 of the produced photoplays for the stock, or a mere compensation to Chaplin for his services as a player-producer in connection with the making of such plays. The latter concept would be difficult to accept in any event, when we consider the wages of the troops of players employed and mechanical costs of production of the reels.

■ We consider the agreement of 1924 controls the prior agreements, none of which explicitly defined the place of ownership. Under that agreement the shares are owned by the artist as appeared on the certificates held by the escrow agent, whose only power, like that of a pledgee, was to transfer them to United if Chaplin failed to perform his contract. One nonetheless owns personal property because held by another to insure the performance of a contract.

We hold that Chaplin owned the common shares at least since 1928, when he received and endorsed the certificates thereafter held by O'Brien; that the Tax Court erred in including their value in his 1935 income.

■ B. *The taxation of dividends paid to O'Brien in the prior tax years, but received by Chaplin in 1935.* The Commissioner contends that the moneys which he admits were paid to O'Brien as dividends in 1930-34 were not dividends when paid Chaplin in 1935, but a mere money compensation to Chaplin under his contract with United, and that it should have been taxed as ordinary income. This contention is based upon the assumption that the shares of stock were not owned by Chaplin in the years when the dividends were paid and is disposed of by what we have held regarding the stock ownership.

With regard to Chaplin's contention that these dividends were not included in his 1935 income, the incidence of the taxation of dividends has long been determined by succeeding identical specific regulations to succeeding provisions of the income tax laws. Section 115 of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Acts, page 703, repeats the provisions of the prior acts,

"§ 115. *Distribution by Corporations*

"(a) *Definition of Dividend.* The term 'dividend' when used in this title (except in section 203(a) (4) and section 207(c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders whether in money or in other property, out of its earnings or profits accumulated after February 28, 1913."

Like preceding Treasury Regulations, Article 115-1 of Treasury Regulations 86 for the Revenue Act of 1934 provides "A taxable distribution made by a corporation to its shareholders shall be included in the gross income of the distributee when the cash or other property is unqualifiedly made subject to their demands."

Here the dividends were never made unqualifiedly subject to Chaplin's demand

prior to 1935 when they were paid over to him. Unlike the shares, he received no economic or other benefits from his ownership; nor did he acquire any unqualified rights in them prior to that year. We hold that, under this regulation, the dividends paid to Chaplin were includible in his gross income for 1935 and were deductible in computing his normal tax for that year.

Decision reversed and case remanded to the Tax Court for a recomputation of Chaplin's tax pursuant to this opinion.

Reversed and remanded.