[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-13053

_____

D.C. Docket No. 1:08-cv-03885-TWT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 19, 2011
JOHN LEY
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANNY C. FORT,
SHERRI E. FORT,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 19, 2011)

Before MARCUS and ANDERSON, Circuit Judges, and ALBRITTON,[*] District
Judge.

---

[*] Honorable W. Harold Albritton, United States District Judge for the Middle District of
Alabama, sitting by designation.

ALBRITTON, District Judge:

This case presents an appeal by Danny C. Fort ("Fort")[1] of a grant of summary judgment in favor of the United States. The government brought this action against Fort to recover a tax refund of over $300,000 that it contends was erroneously refunded. For the reasons set forth below, we affirm the district court's entry of summary judgment in favor of the government.

## I. BACKGROUND

### A. Ernst & Young Sells its Consulting Business to Cap Gemini

In early 2000, Ernst & Young ("E&Y") prepared to spin off and sell its information-technology consulting business to Cap Gemini, S.A. ("Cap Gemini"), a French corporation. At this time, Fort was a partner in that consulting business. On February 28, 2000, E&Y and Cap Gemini executed a Master Agreement that detailed the terms of the transaction.

Under the Master Agreement, the proceeds of the sale were divided among E&Y's partners. For consulting partners who qualified as accredited investors under SEC rules, such as Fort, the consulting partner agreed to terminate his or her interest in E&Y, and in exchange, received a distribution of Cap Gemini shares.

---

[1]Sherri E. Fort is also an appellant in this case, because she filed a joint tax return with Danny C. Fort. For sake of simplicity, we will refer only to Danny C. Fort in this case. However, this opinion is equally effective as to Sherry E. Fort.

Additionally, these partners would begin working at a new entity, Cap Gemini Ernst & Young ("CGE&Y"), under employment agreements containing non-compete clauses.

Cap Gemini shares would not be distributed outright to each partner. Rather, 25% of each partner's shares would be sold immediately to cover that partner's income taxes incurred as a result of this transaction, and the other 75% of the shares (the "Restricted Shares") were placed into an individual account in the partner's name at Merrill Lynch.

The Restricted Shares could not be withdrawn from the partner's account at Merrill Lynch immediately, and therefore, the Merrill Lynch accounts were like escrow accounts. For four years and 300 days following the closing, partners could only sell portions of the Restricted Shares at scheduled times. After the four-year, 300-day period, the partners could withdraw all remaining Restricted Shares from the Merrill Lynch account. Arthur Gordon ("Gordon"), the former tax director of E&Y's consulting practice, who helped structure this transaction, stated that the reason for these restrictions was to prevent all of the partners from selling too many Cap Gemini shares at once, thereby diminishing the value of the shares.

The Restricted Shares were also subject to forfeiture as "liquidated

3

damages" if a partner (1) breached his employment agreement; (2) voluntarily left his employment; or (3) was terminated. The amount of forfeitable shares decreased with each anniversary of the closing date that the partner remained at CGE&Y, so, generally, the longer a partner worked for CGE&Y, the fewer shares he or she would forfeit if the forfeiture provision were triggered.

Additionally, the termination forfeiture requirement applied to only two types of termination, and the number of Restricted Shares forfeited upon termination depended on under which type a partner was terminated. If a partner was terminated "for cause," the partner forfeited the full amount of the forfeitable Restricted Shares. However, if a partner was terminated for "poor performance," the partner forfeited at least 50% of the forfeitable Restricted Shares, but could keep a percentage of the remaining 50%, as determined by a review committee.

Partners also would have dividend and voting rights in the Restricted Shares. The dividends paid on the Restricted Shares were not subject to forfeiture, and partners could withdraw these dividends shortly after they were declared. As for voting, Merrill Lynch's French affiliate would vote a partner's shares "as instructed by [the partner] as beneficial owner."

Because of the restrictions placed upon the Restricted Shares, the Master Agreement stated that, for tax purposes, the Restricted Shares would be valued at

4

95% of the closing price of Cap Gemini stock on the closing date.

**B.    The Partners Vote to Approve the Transaction**

To help the partners determine how to vote on the sale, E&Y prepared a Partner Information Document ("PID"), which summarized the proposed transaction and discussed its tax implications.  The PID stated that the sale "is a taxable capital gains transaction," and that it "has been agreed that Ernst & Young, its partners, and Cap Gemini will treat valuation and related issues consistently for US federal income tax purposes."  The PID further included hypothetical tax calculations that showed the gain from receiving the Restricted Shares was reportable in full in 2000.  It was generally expected that the stock would appreciate in value, and this structure was designed to assure capital gains treatment, with all tax on the then-value of all of the stock being paid in 2000.

At the conclusion of a meeting of partners in Atlanta on March 7 and 8, 2008, 95% of the consulting partners, including Fort, voted in favor of the transaction.

Fort subsequently signed the Partner Agreement, making him a party to the Master Agreement.

**C.    Fort's 2000 Tax Return**

The transaction closed on May 23, 2000.  Twenty-five percent of Fort's

shares were sold at closing and the proceeds turned over to Fort, to cover taxes due based on receipt of the full value of all the stock in 2000. The remaining 75%, the Restricted Shares, were deposited into Fort's Merrill Lynch account.

Fort reported gross proceeds of $1,759,097 from this transaction on his 2000 income tax return. At this time, the Cap Gemini stock was worth approximately $156 per share.

In September 2003, Fort was terminated as part of a downsizing. At this time, the value of the Cap Gemini shares had declined substantially. Cap Gemini did not require Fort to forfeit any of his Restricted Shares. Shortly after his termination, Fort learned that several former E&Y consulting partners had filed amended year 2000 tax returns, claiming that they did not realize income from the Restricted Shares in that year. Fort followed suit, filing his own year 2000 amended return, asserting that he did not realize income in 2000 from the then-value of the Restricted Shares.

The IRS initially accepted Fort's amended return and granted him a refund for his 2000 tax return. Subsequently, however, the IRS determined that the refund to Fort was in error, and the government filed this suit to recover the refund.

**D.     The District Court Grants the Government's Motion for Summary**

**Judgment**

The district court granted the government's motion for summary judgment and awarded it the disputed amount. *United States v. Fort*, No. 1:08-CV-3885-TWT, 2010 WL 2104671, at *3 (N.D. Ga. May 20, 2010). The court stated that taxable income during a given taxable year includes all income from whatever source derived that is "actually" or "constructively" received during that year. *Id.* at *1 (citing 26 U.S.C. § 61(a)(3); 26 C.F.R. § 1.61-2(a)). While the court assumed that Fort did not actually receive the Restricted Shares, it concluded that he constructively received them, because:

> He alone stood to gain or lose money based on the stock's performance. He received the benefit of the dividends paid on the shares, and he had the right to direct how the shares would be voted. Moreover, he knowingly agreed to the sale restriction and the forfeiture provision. He also agreed to the amount of the discount.

*Id.* at *2.

The district court also rejected Fort's argument that the forfeiture provision prevented him from constructively receiving the Restricted Shares in 2000. The court explained that "the fact that the partners risked having to return some of their shares at a later time does not mean that they did not constructively receive the shares in the first place." *Id.*

Subsequently, Fort filed a timely appeal to this court.

7

## II. STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment *de novo*, applying the same legal standards used by the district court. *Galvez v. Bruce*, 552 F.3d 1238, 1241 (11th Cir. 2008). Summary judgment is appropriate where, viewing the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party, there is no genuine issue of any material fact, and the moving party is entitled to judgment as a matter of law. *Id.*

This court may affirm a decision of the district court on any ground supported by the record. *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1088 n.21 (11th Cir. 2007).

## III. DISCUSSION

Fort has appealed the grant of summary judgment in the government's favor, arguing that he did not "receive" the escrowed shares of stock in the year 2000 for tax purposes, and, therefore, was not taxable for their value in that year.

### A.   The *Danielson* Rule

The first issue is the application of the "*Danielson* Rule" to this case. *See Comm'r v. Danielson*, 378 F.2d 771 (3d Cir. 1967). The government argues, citing to *Danielson*, that Fort's ability to challenge his 2000 tax return is limited, because the CGE&Y agreement stated that Fort agreed to report his receipt of the

Restricted Shares as income received in 2000. Fort responds that the *Danielson* rule is inapplicable to this case.

The government's argument is misplaced. *Danielson* and its progeny recognize that parties may agree to a certain form of a transaction, and that if they do, they face a difficult burden in convincing the court that they did not actually engage in the form that they contracted to engage in. *See id.* at 774-75; *Bradley v. United States*, 730 F.2d 718, 720 (11th Cir. 1984) (noting that the *Danielson* rule applies if a taxpayer "challenge[s] the *form* of a transaction") (emphasis added).

Agreeing to a certain form of transaction is significant, because different transaction forms can yield different tax liability consequences. Yet agreeing to *form* (*e.g.*, agreeing to sell A for B on October 18, 1985) is different from agreeing to a certain type of tax *liability* (*e.g.*, agreeing that the result of the transaction will yield no tax liability in 1985). In this case, Fort does not argue that the form of this transaction differed from what was written in the CGE&Y agreement. Rather, he argues that the agreed-upon form had particular tax consequences. Such an argument is outside the scope of the *Danielson* rule. *See, e.g.*, *United States v. Fletcher*, 562 F.3d 839, 842-43 (7th Cir. 2009) (in a case dealing with this same transaction and materially identical facts as the one at bar, the Seventh Circuit rejected reliance on the *Danielson* rule, writing that "because [the former E&Y

9

partner] does not try to recharacterize the transaction, doctrines that limit or foreclose taxpayers' ability to take such a step are beside the point"); *United States v. Nackel*, 686 F. Supp. 2d 1008, 1019 (C.D. Cal. 2009) (in another case involving this same transaction, the District Court for the Central District of California wrote: "The government impermissibly conflates case law concerning a party's effort to look through and re-characterize the form of a transaction with that which addresses what the parties intended would be the tax consequences of a transaction. The former is subject to the heightened scrutiny sought now by the government, the latter is not.").

As the *Fletcher* court expressed it: "Income was constructively received in that year not because the contract said that everyone would report it so to the IRS, but because the parties were *right* to think that this transaction's actual provisions made the income attributable to 2000." *Fletcher*, 562 F.3d at 845.

Because the *Danielson* rule is inapplicable to this case, we now turn to evaluate the tax consequences of the form of this transaction.

**B.   Constructive Receipt**

A taxpayer who uses the cash basis method of accounting, such as Fort, must pay tax on income in "the taxable year in which [it is] *actually or constructively received*." Treas. Reg. § 1.446-1(c)(1)(I) (emphasis added). The

10

district court found that, in 2000, Fort did not *actually* receive income from the Restricted Shares, but *constructively* received it. The government does not dispute this framing of the issue. Accordingly, the issue in this case is whether Fort constructively received income in the amount of the agreed value of the Restricted Shares in 2000.

The Treasury Regulations state that a taxpayer constructively receives income when "it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given." Treas. Reg. § 1.451-2(a). On the other hand, "income is *not* constructively received if the taxpayer's control of its receipt is subject to *substantial limitations or restrictions*." *Id.* (emphasis added). In other words, the more control a taxpayer has over the receipt of income, the more likely the taxpayer has constructively received the income. *See, e.g.*, *Fletcher*, 562 F.3d at 843.

The doctrine of constructive receipt is implicated when a taxpayer receives an asset, but that asset is placed in an escrow account, only to be released to the taxpayer upon the occurrence of some contingency. The fact that an asset is placed in such an account is relevant, but not dispositive, as to the question of whether the taxpayer has constructively received income. As the IRS has stated in

11

a General Counsel Memorandum:

> *Generally*, when assets are placed in escrow as security or otherwise and the taxpayer receives *no right to control or otherwise enjoy* those assets, the courts and the Service have held that income is not realized until such time as the contingency is satisfied and the funds are paid over to the taxpayer. . . .
>
> However, in those cases in which the facts are such that the taxpayer exercises a *considerable degree of domination and control over the assets in escrow*, the courts and the Service have generally held . . . that income is presently realized notwithstanding that the taxpayer lacks an absolute right to possess the escrowed assets.

I.R.S. G.C.M. 37073 (Mar. 31, 1977) (emphasis added) (citing *Chaplin v. Comm'r*, 136 F.2d 298 (9th Cir. 1943); *Bonham v. Comm'r*, 89 F.2d 725 (8th Cir. 1937)).  Consistent with the IRS's position, courts have held that a taxpayer presently realizes income when he or she possesses sufficient indicia of control over the assets held within an escrow account or escrow-type arrangement.

In *Chaplin v. Commissioner*, a company delivered shares of stock to Charlie Chaplin in 1928, who then was required to place the shares in escrow, only to be released when he delivered photoplays to the company in later years.  136 F.2d at 300.  The Ninth Circuit held that the shares were income to Chaplin at the time of the initial delivery in 1928, not later, when Chaplin delivered the photoplays and the shares were released.  *Id.*  The Ninth Circuit emphasized that Chaplin possessed the following indicia of control over the shares in escrow: (1) the

contract at issue vested ownership immediately in Chaplin and the shares were issued in his name; (2) Chaplin had voting rights in the shares; (3) dividends on the shares were declared and paid to an escrow agent who held them for Chaplin's benefit; and (4) Chaplin was considered the owner of the shares. *Id.* at 300-02.

In *Bonham v. Commissioner*, a taxpayer and a company agreed that the taxpayer would receive title in 750 shares of stock, but the shares would be deposited with the company "as a guarantee for [his] performance." 89 F.2d at 726-27. The Eighth Circuit held that the taxpayer realized immediate income when he initially received the 750 shares, not when the shares were later withdrawn. *Id.* at 726-28.

Because Fort was one of multiple former E&Y partners who have argued that receipt of the Restricted Shares did not constitute taxable income in 2000, this court has had the benefit of considering the legal analysis of other courts which have analyzed cases with facts materially identical to those before us today. In each of these cases, the courts held that the receipt of the Restricted Shares constituted income in the year 2000. *United States v. Bergbauer*, 602 F.3d 569, 581 (4th Cir. 2010), *cert. denied*, 131 S. Ct. 297 (2010); *Fletcher*, 562 F.3d at 845; *Nackel*, 686 F. Supp. 2d at 1026; *United States v. Berry*, No. 06-CV-211-JD, 2008 WL 4526178, at *7 (D.N.H. Oct. 2, 2008); *United States v. Culp*, No.

13

3:05-CV-0522, 2006 WL 4061881, at *1 (M.D. Tenn. Dec. 29, 2006).

*United States v. Fletcher*, the case relied upon most heavily by the government, and cited by the district court, is particularly instructive. In *Fletcher*, the Seventh Circuit stated that "a taxpayer's willingness to defer consumption does not defer taxation." 562 F.3d at 843. The court concluded that the CGE&Y agreement was merely a deferral of consumption, not income, for three reasons. *Id.* First, the partners bore the market risk that the Restricted Shares would appreciate or depreciate from the date of the closing, because the market price of the Restricted Shares could rise or fall while the shares were in the Merrill Lynch accounts.[2] *Id.* at 844. Second, because Cap Gemini had already paid the Restricted Shares into the partners' Merrill Lynch accounts, the partners merely agreed to postpone unrestricted access to the stock, rather than to allow Cap

---

[2]Fort argues that whether he bore the risk is irrelevant in determining constructive receipt. We reject Fort's argument. *See, e.g.*, *Rupe Inv. Corp. v. Comm'r*, 266 F.2d 624, 630 (5th Cir. 1959) (considering, in determining that a taxpayer did not own stock for tax purposes, the fact that the taxpayer "was protected against risk of loss and was not entitled to any enhancement in the value of the stock"); *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981); *see also* Treas. Reg. § 1.83-3(a)(6) (suggesting that in the context of employee stock options, "[a]n indication that no transfer has occurred is the extent to which the transferee does not incur the risk of a beneficial owner that the value of the property at the time of transfer will decline substantially").

Fort also argues that, factually, due to the potential his shares could be forfeited, other parties besides Fort bore some of the risk. Fort's argument is unpersuasive. While the potential for forfeiture existed in *Chaplin* and *Bonham*, the courts in those cases did not find that this potential eliminated constructive receipt. We agree with this reasoning.

14

Gemini to pay them later. *Id.* Third, the partners agreed to value the Restricted Shares at a discount—95% of the market price of the underlying shares on the closing date—which reflects "not only illiquidity but also the risk that [Cap Gemini] would use its power over the account in an unauthorized way, or that Merrill Lynch might fail in its duty as a custodian." *Id.*

We are persuaded by the Seventh Circuit's opinion and agree with its reasoning. We find that the transfer restrictions, which prohibited Fort from accessing the shares in the Merrill Lynch account for several years, were merely a delay of consumption, not a delay of income. Indeed, the partners wanted to restrict transfer of the shares to prevent a massive sell-off shortly after the closing date, which would have depressed Cap Gemini's stock price.

In any event, Fort had several rights over the Restricted Shares that constitute evidence of constructive receipt under *Chaplin* and *Bonham*.[3] First, the Restricted Shares were deposited into a Merrill Lynch account in Fort's name, and were held in that account for Fort's benefit. *See Chaplin*, 136 F.2d at 300-02 (finding it significant that the stock was issued in the taxpayer's name and that the

---

[3]Fort argues that *Chaplin* and *Bonham* turned on whether the taxpayers in those cases initially received the shares of stock, and then deposited those shares into an escrow account, a fact not present in Fort's case. We reject that contention, as the *Chaplin* court did not appear to find this fact significant, and the *Bonham* court specifically stated that "[t]he circumstance is unimportant that the stock was not physically delivered to petitioner and then redelivered by him to the company upon the pledge." *Bonham*, 89 F.2d at 727-28.

taxpayer was considered the owner of the stock). Second, Fort had both dividend and voting rights over the Restricted Shares. *See id.* at 301-02 (finding dividend and voting rights significant). Third, the shares were to be released only if Fort stayed at CGE&Y for four years and 300 days, and therefore, the shares served as a guarantee of Fort's performance. *See id.* at 300-02 (finding constructive receipt when escrow account deposit acted to ensure taxpayer's performance); *Bonham*, 89 F.2d at 726-27 (noting that stock was held as a guarantee for taxpayer's performance).

Fort argues that, regardless of the above facts, he did not have "control" over whether he ultimately received the Restricted Shares, because the shares were subject to forfeiture if he was terminated for "poor performance." Fort contends that "poor performance" really means any reason at all. Fort argues that if he could be fired for any reason at all, then the Restricted Shares were not simply being held as a guarantee for his performance, as in *Chaplin* and *Bonham*, but rather, they were being held completely at the will of CGE&Y. Fort notes that Gordon testified that approximately 10% of the consulting partners forfeited their shares for reasons he defined as "involuntary" or "involuntary resignation." Fort further asserted that Gordon described these employees as ones who were terminated "not because they are not trying, [but] because the industry has

16

changed or their expertise is gone."[4]

If the Restricted Shares could be forfeited for reasons completely out of Fort's control, this would be some evidence that Fort lacked control over the Restricted Shares. *See Nackel*, 686 F. Supp. 2d at 1022 ("The likelihood of the forfeiture provisions being effectuated, and who controls the realization of that fact, are important in determining whether the stock so held is nonetheless constructively received.") (citing *Chaplin*, 136 F.2d at 299-302). However, we conclude that Fort had sufficient control over whether his shares would be forfeited.

First, the Partnership Agreement required complete forfeiture on involuntary termination only if the termination was for cause or, in a lesser amount, if it was for poor performance. There was no forfeiture at all if termination was for any other reason. Moreover, factually, CGE&Y did not use the poor performance provision to terminate partners for any reason at all. Instead, Gordon explained that consulting partners who were terminated for poor

---

[4]Fort cites the case of *Palowitch v. Cap Gemini Ernst & Young, US., LLC*, No. 114312/01, 2004 WL 2964426 (N.Y. Sup. Ct. June 3, 2004), in which the plaintiff claimed that CGE&Y terminated him for "poor performance," but did so "without stating a reason." *Id.* at *1. However, as the government correctly points out, *Palowitch* does not establish that the taxpayer was terminated for no reason, but rather, it shows that the termination letter sent to the taxpayer did not state a reason for his termination. *See id.* In any event, the *Palowitch* court did not analyze whether CGE&Y had a reason for termination in that case.

17

performance were individuals who "*did not meet their objective* in one or more of [the] categories" upon which performance was judged and individuals who "were collecting a check and *not worrying about trying to do their best*." In fact, when partners were terminated for reasons outside of their control, such as shifts in needs of industries, Gordon stated that those partners were allowed to keep their shares. And, as noted earlier, Fort himself was not required to forfeit any of his Restricted Shares when he was terminated due to downsizing.

Additionally, the *Nackel* court squarely confronted this issue and concluded that "poor performance" did not mean termination for any reason. *Nackel*, 686 F. Supp. 2d at 1023. That court concluded that "poor performance" referred to the "poor quality of the ex-consulting partner's performance" and that the "emphasis under this condition remains on the partner's relative performance . . . [and this] is something within that partner's means to control." *Id.*

We agree, and also note that the plain meaning of being terminated for "poor performance" is not being terminated for any reason at all. Rather, poor performance clearly refers to unsatisfactory performance. It would be a strained interpretation, and one we will not adopt, to hold that "poor performance" does not really mean poor performance, but actually means "any reason at all." To do so would be to expand the reasons for which forfeiture could be required beyond

those to which the partners agreed.

Fort also suggests that "poor performance" allows for termination on the basis of a subjective judgment. While we agree that the term "poor performance" potentially might require some subjective judgment by an employer, we conclude that the mere potential for subjective judgment does not foreclose constructive receipt. *Cf. Nackel*, 686 F. Supp. 2d at 1023 (suggesting that the "poor performance" provision is an objective measure, which focuses on a partner's relative performance); *Fletcher*, 562 F.3d at 845 ("The sort of contingencies that could lead to forfeitures were within the ex-partners' control.").

Additionally, we reject Fort's argument that he lacked control due to the fact that his performance could have been considered "poor" in part due to market conditions. To have sufficient control for constructive receipt does not require "total control." In any event, as previously noted, CGE&Y in practice did not seek forfeiture when a partner's poor performance was primarily caused by market shifts and not the partner's poor efforts.

In sum, Fort constructively received the Restricted Shares in 2000. The fact that Fort could not access the shares immediately was merely a postponement of consumption, not income: CGE&Y paid the full consideration of the shares into Fort's Merrill Lynch account on the closing date, and therefore, Fort bore the

19

market risk of share appreciation or depreciation beginning on the closing date. This conclusion is buttressed by the fact that Fort possessed indicia of control over the shares: he had dividend and voting rights in the shares, and the shares were held in an individual account in Fort's name. Additionally, constructive receipt was not impossible simply because Fort was required to forfeit the shares upon the occurrence of certain conditions, because Fort had sufficient control over whether those conditions would occur. Therefore, Fort realized income at the time the Restricted Shares were transferred into his Merrill Lynch account in 2000.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM.

**AFFIRMED.**