BIG LAKE OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 52803. Promulgated September 23, 1936.

*S. Leo Ruslander, Esq.*, for the petitioner.
*Conway N. Kitchen, Esq.*, for the respondent.

#### OPINION.

MURDOCK: The Commissioner determined a deficiency of $97,009.85 in the petitioner's income tax for the calendar year 1927. He also determined a deficiency for 1926, but the issue relating to that year has been waived. The only issue is whether the petitioner is taxable in 1927 with $598,571.01, representing the agreed fair market value in January 1927 of 2,450 shares of stock of the Reagan County Purchasing Co., which the Commissioner determined were received by the petitioner in January 1927. Most of the facts in the record

have been stipulated. The stipulated facts will not be set forth herein in full.

The petitioner and other producers in a certain oil field had no access to a pipe line in 1924. They entered into an agreement with the Marland Oil Co. on October 22, 1924, whereby the Reagan County Purchasing Co. was organized to build a pipe line to the field. The Marland Oil Co. put up the necessary cash as needed, through subscriptions for the preferred stock of the new company. The preferred stock was to be retired rapidly out of the first earnings of the new company. The Marland Oil Co. also paid in $500 and received 51 percent of the common stock. The petitioner and the other producers entered into contracts with the new company agreeing to sell their oil to it up to certain amounts not exceeding 20,000 barrels per day. The parties agreed that 49 percent of the common stock should be divided among these producers as part consideration for their agreements to sell their oil to the new company. A certificate for one-half of the 49 percent was issued in the name of the petitioner and a certificate for the remainder of the 49 percent was issued in the names of the other producers, jointly. These two certificates were endorsed, delivered to an "escrow agent", and held by the latter for the benefit of the producers in such proportion as should be agreed upon between the producers, to be evidenced by a written agreement filed with the escrow agent. The 49 percent was not to be sold except to the Marland Oil Co. or to another of the producers after their respective interests had been agreed upon. Each certificate was stamped to show that it was subject to the restrictions contained in the agreements. The escrow was to continue until all of the preferred stock had been retired. New certificates were to be issued whenever the producers agreed upon the amount of the 49 percent each was to own. If the escrow was still in effect, these new certificates were to be placed with the escrow agent, as the others had been, pending the retirement of all of the preferred stock.

The producers had agreed among themselves in 1924 that "The said forty-nine per cent (49%) of the stock shall be divided between us as soon after December 1, 1926, as can conveniently be done, based proportionately upon the amount of oil that we each deliver to the purchasing company between December 1, 1925 and December 1, 1926, in fulfilling or attempting to fulfill deliveries of twenty thousand (20,000) barrels per day." Deliveries in excess of 20,000 barrels were not to count. The petitioner had nine producing wells and was producing about 4,000 barrels per day at the time of entering into the agreements. The other group of producers had one well and was producing about 1,400 barrels per day. The proven

acreage belonging to the petitioner was much larger than that belonging to the other group. The officers of the petitioner, at the time in 1924 when the agreements were executed, confidently believed that the petitioner would be able to deliver at least 10,000 barrels per day during the period from December 1, 1925, to December 1, 1926, and that it would thereby become entitled to one-half of the 49 percent, or 2,450 shares.

The contracts were carried out in accordance with their terms. Both groups delivered more than 10,000 barrels per day during the period specified. The last remaining preferred stock was retired on January 1, 1927. The petitioner and the other producers executed a letter of instructions to the escrow agent in January 1927 (but dated December 15, 1926, and authorized in December 1926) terminating the escrow and advising:

SECOND. Further, that the true and ultimate ownership of said forty-nine per cent (49%) of the common stock of Reagan County Purchasing Company, Inc. (being all and the same shares evidenced by the aforesaid certificates No. C–2 and No. C–3 for 2450 shares each), has been determined by and between Big Lake Oil Company, on the one hand, and Texon Oil and Land Company, Group No. 1 Oil Corporation, and Group No. 2 Oil Corporation, aforesaid, on the other hand, and this agreement as to the said last named four corporations is intended, and shall be taken to evidence the agreement between said named companies as to such true and ultimate ownership of said 49% of the common stock, and for that purpose, among other things, this agreement is executed and the duplicate original copies are filed with your bank as Escrow Agent, and with Reagan County Purchasing Company. The true and ultimate ownership of said 49% of the common stock of said Reagan County Purchasing Company as last herein referred to, is now agreed and determined to be as follows:

To Big Lake Oil Company, twenty-four Hundred and Fifty (2450) shares (To Texon Oil and Land Company; Group No. 1 Oil Corporation; Group (No. 2 Oil Corporation (by one joint certificate), Twenty-four (Hundred and Fifty_____ (2450) shares

The petitioner received a certificate for 2,450 shares in March 1927, free of any restriction. It never reported any income from the receipt of the shares.

The Commissioner determined that the petitioner received the 2,450 shares in 1927, and their fair market value at that time was taxable income of the petitioner for 1927. The figures are not in dispute. The only question is whether there was any realization of income in 1927.

The petitioner states in its brief that it relies upon two points, one that "the date of acquisition, for income tax purposes, of said Reagan County Purchasing Company stock was December 8, 1924", and the other that the stock was acquired in 1924 in a nontaxable exchange. The original certificate issued in the name of the petitioner was dated December 8, 1924. The petitioner contends that, since the

stock was issued "fully paid and nonassessable" in 1924 for a consideration which passed at that time and there was no uncertainty about the production of the petitioner, the petitioner acquired title to 2,450 shares at that time. It says the only uncertainty was whether the other group of producers would qualify to take the other one-half of the 4,900 shares making up the 49 percent.

However, the parties agreed to withhold the vesting of title and they could not sell the shares until the test period was over and their agreement was filed with the escrow agent. Furthermore, the evidence fails to show that there was no uncertainty in 1924 about the ability of the petitioner to deliver its full quota of 10,000 barrels per day during the period December 1, 1925, to December 1, 1926. It was producing only about 4,000 barrels daily at that time. The evidence is merely that its officers firmly believed it would produce its full share and that its territory and production were then better than those of the other group. But, what is more important, actual receipt, not the certainty of receiving income, is the basis of reporting. Sec. 213 (a), Revenue Act of 1926. The petitioner did not actually receive the stock until 1927. Why and upon what theory should its value have been taken into income prior to that time? Constructive receipt is the only theory upon which to base the petitioner's argument.

The petitioner argues that if there were conditions precedent to the vesting in it of title to 2,450 shares, then the events (the delivery of oil during the test period) occurred and title passed at the close of the period on December 1, 1926. But after that the parties were allowed a reasonable time to agree as to the ownership of the stock and file their agreement with the escrow agent and the issuing company. These were also conditions precedent to the vesting of title to any definite number of shares in the petitioner. Until that writing was filed the escrow agent was to hold the stock as originally placed with it. Then, and only then, were the producers entitled to new certificates in definite amounts. The escrow for the benefit of the preferred stockholders was an independent arrangement restricting the sale of the 4,900 shares. It happened to be terminated at the same time that the producers filed their agreement. Still, the escrow agent held the shares in an indefinite amount for the benefit of the producers until they agreed upon definite amounts and filed their agreement with the escrow agent. The petitioner's right to any specific shares was contingent until the oil was delivered and the agreement filed. Even if title vested prior to 1927, the income was not taxable until 1927. Cf. *K. E. Merren*, 18 B. T. A. 156 (affirmed on another point, 51 Fed. (2d) 44); *Otto Braunworth*, 22 B. T. A. 1008.

Constructive receipt is a fiction and is sparingly applied. It ought not to be invoked to permit a taxpayer to escape tax except, perhaps, in a very clear case and for some unusual reason which does not presently occur to us. If property is credited or set aside for a taxpayer, subject to his unqualified demand without any substantial limitation or restriction, it may, under some circumstances, be regarded as constructively received for income tax purposes prior to its actual receipt. The petitioner has not shown that the 2,450 shares were unqualifiedly subject to his demand prior to 1927. The evidence indicates that there were substantial limitations and restrictions on the petitioner's rights to any shares prior to 1927 when the producers filed their agreement of division as required by the agreement of October 22, 1924. The petitioner would have had a valid defense had the Commissioner tried to tax this income as constructively received in any year prior to 1927. Cf. *Stoner* v. *Commissioner*, 79 Fed. (2d) 75; *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, 423; *Preston R. Bassett*, 33 B. T. A. 182. The petitioner does not want it shifted to 1926 but contends only that it was income in 1924. In that, the petitioner is clearly wrong.

The petitioner next makes a brief argument that the shares were acquired in 1924 in a nontaxable exchange. It cites section 203 (b) (4) of the Revenue Act of 1924, which is as follows:

(4) No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

The Marland Oil Co. subscribed and paid in cash for preferred stock, not at once but as the cash was needed, and it also subscribed and paid in cash for 51 percent of the common stock of the Reagan County Purchasing Co. The producers transferred nothing to the new corporation, but merely entered into contracts with it. Neither the petitioner nor any other producer received any certain amount of the stock or securities of the new corporation in 1924 and it could not have been said in 1924 that "The amount of stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange." The respective interests in "the property" prior to the "exchange" could not have been determined either. We do not think the section applies or was intended to apply to such a transaction as took place in 1924.

*Decision will be entered for the respondent.*