Marts, Inc. v. Commissioner.
Marts, Inc. v. Commissioner
Docket No. 71700.
United States Tax Court
T.C. Memo 1960-127; 1960 Tax Ct. Memo LEXIS 161; 19 T.C.M. (CCH) 669; T.C.M. (RIA) 60127; June 16, 1960
*161 Held, that the amount of $12,750 paid by petitioner corporation to a former executive employee constituted additional compensation to such employee, rather than purchase price of shares of petitioner corporation's stock which said employee, at the time his employment was terminated, placed in escrow for subsequent retransfer to petitioner. Said amount is, accordingly, deductible by petitioner under section 162(a)(1) of the 1954 Code. Robert E. Kline, Esq., for the petitioner. Charles A. Boyce, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: Respondent determined a deficiency in the income tax of the petitioner for its taxable fiscal year ended April 30, 1955, in the amount of $1,062.95. The sole issue for decision is whether all or any portion of the sum of $12,750, paid by the petitioner corporation in the taxable year to an individual who had formerly been one of its executive employees, represented additional compensation to such employee; or whether the same represented part of the purchase price of certain shares of petitioner's stock which such individual, at the time of his employment was terminated, placed in *162 escrow for retransfer to petitioner. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits annexed thereto, is incorporated herein by reference. Petitioner is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business at Pittsburgh, Pennsylvania. It filed a return for its fiscal year ended April 30, 1955, with the district director of internal revenue at Pittsburgh. During the year 1952, Benjamin and Joseph Levy were the officers, directors, and owners of the majority of the shares of capital stock of a group of 20 corporations, each of which corporations operated a single grocery supermarket. The 20 constituted a chain or group of stores, and the entire group is hereinafter referred to as the "Sparkle Group," such name being derived from the name "Sparkle" which was given to several stores in the group. Benjamin Levy was the president of each corporation; and Joseph Levy was the vice president and treasurer of each, as well as the general manager of the group and of the warehouse used by the group in its operations. In the early part of 1952, the Levys decided that they *163 would form a new corporation which would hold all the stock of all the corporations in the Sparkle Group; and they also determined that steps should be taken to hire an executive employee who could be groomed to take over some of the general managerial duties which Joseph Levy was then performing, and thus make the Sparkle Group less of a "one man operation." Joseph Levy, in the course of his search for such an executive, was introduced to an individual named Herbert Walker. Walker was at the time employed by a large department store in Pittsburgh, as a merchandising executive, at an annual salary and bonus totaling approximately $18,000 or $19,000. Walker was not completely satisfied with his position at the department store, for the reason that it was not then possible for him to acquire any stock ownership interest in the store. In the course of his negotiations with Joseph Levy, Walker stated that he would not be interested in a position with the Sparkle Group unless provisions were made for him to acquire some of the stock of the corporation or corporations by which he would be employed. On July 15, 1952, Joseph Levy and Benjamin Levy (as the owners of the majority of the *164 shares of stock of the corporations composing the Sparkle Group) and Walker entered into an employment agreement. Under the terms of such agreement Walker was to become an employee of a corporation that was to be organized for the purpose of acquiring the stock of the corporations in the Sparkle Group. The agreement further provided, in substance, as follows: "(1) The new corporation was to be authorized to issue two classes of common capital stock, Class A and Class B, each having a par value of 10 cents per share. The Class A and Class B stocks were to be equal in so far as voting rights and dividends were concerned; but, in the event of liquidation, the holders of the Class A shares were to receive the book value of their shares before any distribution should be made with respect to the Class B stock. "(2) The existing shareholders of the corporations in the Sparkle Group (i.e., Joseph and Benjamin Levy and their families) were to exchange their shares in such corporations for the Class A shares of the corporation proposed to be formed. Class B shares were to be issued to Walker at par value, in sufficient quantity to assure him a 20 percent interest in the total of the authorized *165 and outstanding shares of both classes of stock. In addition, Walker was accorded the right to purchase 20 per cent of any new and additional shares which the proposed corporation might be authorized to issue, so that his 'right to twenty (20%) percent ownership in the set-up may be preserved.' "(3) Approximately 44 per cent of the Class B shares were to be issued and delivered to Walker immediately following organization of the proposed corporation; and the remaining 56 per cent of shares were to be issued to him on August 1, 1953, unless prior to such date the corporation indicated its dissatisfaction with Walker's services. In this latter event, the shares issued to Walker should be 'returned to the Company [i.e., the corporation proposed to be organized] and reimbursement of the purchase price thereof' should be made to Walker. "(4) While Walker was employed by the corporation he was not to sell, transfer or encumber the Class B shares issued to him. Upon the termination of Walker's employment, the agreement provided for disposition of the Class B shares as follows: 'you shall sell and the Company shall purchase your shares of stock at book value thereof at the time; provided, *166 however, that should the Company terminate your employment before the expiration of the probationary period [defined infra] and before the Company has elected to affirm its satisfaction, it shall pay you the greater amount of (a) book value at the time of termination of all shares which you own, or (b) the difference between the aggregate salary and compensation paid to you from commencement to termination of your employment and Eighty-five thousand ($85,000.00) dollars; said payment shall be for (1) the re-purchase by the Company at book value at the time of any shares of stock of the Company or any related Company which you own, and if there is any excess, (2) as compensation for the termination of the contract. Payment of any sums due under the foregoing provisions of this paragraph shall be made in equal monthly installments over a period of ten (10) years, together with interest on unpaid balances at the rate of four (4%) percent per annum, but in no event less than Fifteen thousand ($15,000.00) dollars per year; with the right in the Company to anticipate payment at any time. An appropriate legend of this restriction shall be endorsed upon your certificates of stock.' "(5) *167 Walker was to be employed for a period of 3 years and 5 months, beginning August 1, 1952 (or until January 1, 1956), at a minimum salary of $25,000 per year. Such period was referred to as a 'probationary period.' At or prior to the expiration of such probationary period, the corporation was to have the right to affirm its satisfaction with Walker's services, in which event the term of his employment was to be extended for a period of 5 years after January 1, 1956. Also, Walker was to be elected an officer and director of the corporation to be formed, as well as of all the corporations in the Sparkle Group." Walker entered the employ of the Sparkle Group on August 1, 1952. The proposed corporation contemplated by the above agreement was organized on February 5, 1953, with Joseph Levy and Benjamin Levy as incorporators. Said corporation was called Marts, Inc., and it is the petitioner in the instant case. At all times material, it kept its accounts and filed its income tax returns on an accrual basis. By resolution of its board of directors, the petitioner corporation assumed the obligations of the above-described employment agreement which had been entered into by its incorporators *168 and Walker; and Walker thereupon became an employee of the petitioner. He was elected vice president and a director of the petitioner corporation; and he became its general manager and one of its key executives. Upon the organization of petitioner, 36,000 shares of its Class A stock were issued to the Levy interests, who turned in their shares of the corporations in the Sparkle Group in exchange therefor. Nine thousand shares of petitioner's Class B 10-cent par value common stock were authorized and issued to Walker, but he immediately endorsed back to petitioner 5,000 of such shares and retained 4,000 shares. [1] Such 4,000 shares had a book value of $3,670 at the time the same were issued. At the time Walker was issued the 4,000 shares, he was not asked to pay for such shares; however, an account receivable from him was set up on petitioner's books in the amount of $400, representing the purchase price of 4,000 shares at 10 cents per share. Walker never made any payment for such shares, nor did the petitioner ever request that he do so. The stock certificate representing said 4,000 Class B shares bore on its face a typewritten notation indicating that there were restrictions on *169 the transferability of the shares represented by such certificate. At some time prior to August 1, 1953, Joseph Levy informed Walker that the petitioner and the Levy interests were not satisfied with his services, and that the additional 5,000 shares of petitioner's Class B stock would not be reissued to him. Walker was told that he could remain in petitioner's employ for a longer period if he chose to do so. Walker retained his employment with the petitioner until June 1954. Under date of July 27, 1954, a letter agreement *170 was entered into by and between the petitioner corporation, Walker, Joseph Levy individually, and Joseph Levy as executor of the estate of Benjamin Levy, who had died in 1953. The pertinent parts of such agreement are as follows: "All of the parties interested have agreed that your employment shall terminate as of June 19, 1954, and all obligations of all the parties under * * * [the above-described employment agreement] shall be released, discharged and cancelled. "Calculations of the amount owing to you under the terms of the [employment] agreement [of July 15, 1952] show that there was due you the sum of $37,200.00. We have paid you on account the sum of $4,000.00, leaving a balance of $33,200.00, which we agree to pay in monthly installments of $1,250.00, with interest at 4% per annum, commencing October 1, 1954, with the right on our part to anticipate payment at any time, all of which is in accordance with the terms of the agreement. [2]
"We hereby release and discharge *171 you from any claims that we may have arising out of the * * * agreement dated July 15, 1952, and any and all liabilities thereout. "You agree to and do hereby release and discharge JOSEPH LEVY, ESTATE OF BENJAMIN LEVY, DECEASED, * * *, MARTS, INC., and any and all of the subsidiaries of Marts, Inc., from any claims and liabilities arising out of the said agreement, excepting, however, the obligation to make payment of the sum of $33,200.00, which we have agreed to do. "* * * "You shall deposit with Jacob A. Markel, Esquire, Certificate No. B1 of Marts, Inc., evidencing the ownership of 4,000 shares of Class B common stock, who, by this letter, is instructed to hold the same in escrow until the conditions of payment as hereinabove set forth have been fulfilled and all payments have been made, and as security therefor." Pursuant to the terms of the foregoing agreement, Walker turned over his 4,000 shares of petitioner's Class B stock to Markel, to be held by the latter in escrow pending payment in full of the $33,200 mentioned in such agreement as owing to Walker. At the time when Walker's employment with the petitioner was terminated, the book value of said 4,000 shares was $23,786. *172 None of the Class B shares of petitioner's stock has ever been sold, or offered for sale, to anyone except Walker. Walker has now been paid in full all amounts owing to him under the termination agreement of July 27, 1954. During petitioner's fiscal year ending April 30, 1955, and pursuant to said agreement, petitioner paid to Walker the sum of $12,750, plus interest of $1,030.58, or a total sum of $13,780.58. In its Federal income tax return for said taxable fiscal year, the petitioner deducted the amount of $13,780.58 as an ordinary and necessary business expense for contract termination. The respondent in his statutory notice of deficiency, determined that $12,750 of said $13,780.58 was not an allowable deduction for Federal income tax purposes. Opinion In National Clothing Co. of Rochester, 23 T.C. 944, this Court considered an issue similar to that involved in the instant case. There a corporation had entered into agreements with three key employees, under which they purported to purchase shares of the corporation's common stock on terms and conditions which were comparable to those contained in the employment agreement in the instant case. Upon termination *173 of the employment of said key employees, the corporation recovered the stock, and paid the employees amounts representing the increase in the book value of the same for the periods that their employment agreements were outstanding; and it then claimed deductions for the amounts so paid, as additional compensation. This Court sustained the corporation's position; and in its opinion, it stated in part as follows: "The contracts specifically referred to the employment of these individuals and gave the company the right to repurchase the shares upon the termination of their employment. It has been testified without contradiction that the company at all times intended to repurchase the shares pursuant to the contracts upon the termination of the employment of the individual, and they were repurchased as each individual's employment terminated. Thus the benefits were limited to the periods of employment of the employees. * * * The employees could not sell any of these shares without the consent of National and National did not intend that any of them should go into the hands of outsiders. "It seems reasonable to conclude from all of the terms of the contracts and from all other pertinent *174 facts in the record that these transactions, although in form sales, were in substance not sales but rather a means of compensating these employees for the services which they were expected to render to the corporation so that it would prosper and the book value of its stock would increase, thus benefiting both employer and employee. * * *" This Court further stated in its opinion: "Arrangements somewhat similar to those here involved have been regarded for tax purposes as the payment of compensation rather than sales [citing several cases]." The Commissioner announced his acquiescence in this Court's decision in said case, 1956-1 C.B. 5. We think that the issue here considered is not distinguishable in principle from the issue decided in the National Clothing Co. case. Here, the shares of stock involved were issued to Walker for a price of $400, equal to the par value thereof, notwithstanding that the book value was then $3,670; and actually Walker did not pay, nor was he ever asked to pay, even this $400 price. Also, under the employment agreement, Walker could not sell, transfer, or encumber any of the shares while he was employed by the petitioner. Throughout *175 his employment, he worked only on a probationary basis, which was subject to termination by such corporation at any time. And when his employment was terminated by petitioner, he was required to take steps for retransfer of the shares back to the corporation. These facts are similar to those involved in the National Clothing Co. case, supra; and we think that the holding therein is controlling here. Moreover, it is to be observed that when in the instant case Walker's employment was terminated, the shares of stock here involved were neither immediately redeemed by, nor immediately retransferred to, the petitioner corporation; rather, under the new agreement made at said time, these shares were thereupon placed in escrow with a third party, where they were to be held until such time as the full amount of the agreed termination payment of $37,200 had been fully paid. The result of this was that title to the stock did not at that time pass to the petitioner, so as to effect a closed and completed transaction with respect to which gain or loss could then be computed. Cf. Big Lake Oil Co. v. Commissioner, (C.A. 3) 95 F. 2d 573, affirming 34 B.T.A. 1003, certiorari *176 denied 307 U.S. 638. On the other hand, the liability of petitioner to pay that portion of the $37,200 which was designated in the employment agreement to be "compensation for the termination of the contract," accrued immediately and was not subject to any postponement. The amount so allocable to this "compensation" was $13,414 ($37,200, less stipulated book value of stock, $23,786). We think that such circumstance provides an additional reason why the payments totaling $12,750 (which are the only payments here involved) should be attributed to said immediately accrued liability for "compensation for the termination of the contract." On the basis of all the foregoing, we hold that the petitioner is entitled to deduct for its fiscal year here involved, the amount of $12,750 which it paid to Walker during said taxable year. Decision will be entered under Rule 50. Footnotes
1. It will be noted that the 9,000 shares of Class B stock constituted 20 per cent of the total of 45,000 shares outstanding (36,000 shares of Class A, plus 9,000 shares of Class B). It will also be noted that the 4,000 shares which Walker retained, constituted approximately 44 per cent of the Class B shares which were, under the terms of the employment agreement above described, to be issued to him upon the organization of the petitioner. The 5,000 shares endorsed back to the petitioner by Walker constituted the remaining 56 per cent of the Class B shares which were to be issued to Walker on August 1, 1953, if his services proved acceptable to the petitioner.↩
2. The above-mentioned sum of $37,200 was computed as follows: Agreed total compensation, $85,000; salary paid under employment agreement, $47,800; balance to be paid on termination, $37,200.↩