T.C. Memo. 2012-18

UNITED STATES TAX COURT

PECO FOODS, INC. & SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13789-08.                    Filed January 17, 2012.

James H. Williams, III and John S. Rice, for petitioner.

William B. McClendon and Francis C. Mucciolo, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Peco Foods, Inc. (Peco), is an Alabama
corporation and the parent company of an affiliated group of
corporations that file their Federal income tax returns on a

consolidated basis.[1]  Peco petitioned the Court to redetermine respondent's determination of Federal income tax deficiencies of $120,751, $678,978, and $727,323 for its taxable years ended March 28, 1998 (1997 taxable year), April 3, 1999 (1998 taxable year), and March 30, 2002 (2001 taxable year), respectively.[2] Following a trial of this case, we decide whether Peco may modify purchase price allocations which it agreed to in connection with its acquisition of certain assets at two poultry processing plants.  We hold it may not.

FINDINGS OF FACT

Some facts were stipulated.  We incorporate herein by this reference the parties' stipulation of facts and the exhibits submitted therewith.  We find the stipulated facts accordingly. When the petition was filed with the Court, Peco's mailing address was in Tuscaloosa, Alabama.

I.  <u>Background</u>

Peco is the common parent of an affiliated group of corporations.  The other members of the affiliated group are Peco Farms, Inc. (Peco Farms), Peco Foods of Mississippi, Inc. (PFMI), and Peco Foods of Brooksville, Inc.  At all relevant times, Peco

---

[1]We generally use the term "Peco" to refer without distinction to Peco or one or more of its affiliated subsidiaries.  We name the affiliated corporations individually only where we believe it is necessary to do so for clarity.

[2]Some dollar amounts have been rounded.

and the members of its affiliated group were engaged in the business of poultry processing.

II.  Acquisitions

   A.  Overview

During the mid-to-late 1990s, Peco acquired two poultry processing plants.  First, Peco acquired a poultry processing plant in Sebastopol, Mississippi (Sebastopol plant).  Second, Peco acquired a poultry processing plant in Canton, Mississippi (Canton plant).  We collectively refer to Peco's acquisitions of the Sebastopol plant and the Canton plant as the acquisitions.

   B.  Sebastopol Acquisition

Peco, through PFMI and Peco Farms of Mississippi, LLC (LLC), acquired certain assets of the Sebastopol plant (Sebastopol acquisition) from Green Acre Farm, Inc. (Green Acre) for $27,150,000.  The Sebastopol acquisition was effected through an asset purchase agreement dated December 29, 1995 (Sebastopol agreement).  Included in the Sebastopol agreement was a schedule (original Sebastopol allocation schedule) which allocated the purchase price of the acquired assets between PFMI and LLC as the purchasing subsidiaries.  In particular, Peco and Green Acre agreed to allocate the $27,150,000 purchase price among 26 assets "for all purposes (including financial accounting and tax purposes)" in accordance with the original Sebastopol allocation

schedule.  The original Sebastopol allocation schedule allocated the purchase price as follows:

| Asset | PFMI | LLC | Total |
|---|---|---|---|
| Processing plant building | $3,802,550 | -0- | $3,802,550 |
| Holding shed #1 | -0- | $64,800 | 64,800 |
| Holding shed #2 | -0- | 75,395 | 75,395 |
| Fuel tanks | -0- | 61,000 | 61,000 |
| Waste water treatment plant lagoon | 112,000 | -0- | 112,000 |
| Rail spur | -0- | 86,625 | 86,625 |
| Weightronic truck scale | -0- | 55,000 | 55,000 |
| Fencing | 27,700 | -0- | 27,700 |
| Utility extension | 50,000 | -0- | 50,000 |
| Concrete and paving | 50,000 | -0- | 50,000 |
| Site work | 100,000 | -0- | 100,000 |
| Hatchery real property | -0- | 1,509,125 | 1,509,125 |
| Feedmill | -0- | 1,005,700 | 1,005,700 |
| Waste water treatment plant | 1,879,545 | -0- | 1,879,545 |
| Egg farm | -0- | 96,625 | 96,625 |
| Land | | | |
|   Processing plant | 106,500 | -0- | 106,500 |
|   Hatchery | -0- | 10,000 | 10,000 |
|   Feedmill | -0- | 2,500 | 2,500 |
|   Egg farm | -0- | 10,000 | 10,000 |
|   Waste water treatment plant | 6,000 | -0- | 6,000 |
| Rolling stock | -0- | 280,500 | 280,500 |
| Furniture and equipment | 100,620 | -0- | 100,620 |
| Machinery and equipment | 3,785,420 | 2,178,720 | 5,964,140 |
| Inventories (estimated) | 384,237 | 6,265,763 | 6,650,000 |
| Accounts receivable (estimated) | 4,000,000 | -0- | 4,000,000 |
| Goodwill | -0- | 1,043,675 | 1,043,675 |
|   Total | 14,404,572 | 12,745,428 | 27,150,000 |

The Sebastopol agreement defined the term "Real Property" as "real property, leaseholds and subleaseholds therein, improvements, fixtures, and fittings thereon, and easements, rights-of-way, and other appurtenants thereto (such as appurtenant rights in and to public streets located within the state of Mississippi)".  The term "Equipment" was defined as "tangible personal property (such as machinery, equipment, computer hardware and software, furniture, automobiles, trucks,

tractors, trailers, tools, jigs, and dies) located within the state of Mississippi".

In connection with the Sebastopol acquisition, Peco engaged William A. Payne (Mr. W. Payne) of PayneSmall Investment Property Appraisals (PayneSmall) to appraise the Sebastopol plant (Sebastopol appraisal). The Sebastopol appraisal, dated January 25, 1996, listed more than 750 separately identifiable assets. That list generally reported the acquisition date, acquisition cost, cost multiplier, replacement cost, effective age, economic life, and depreciated life of each of the separately identified assets. Mr. W. Payne was deceased at the time of trial.

C. Canton Acquisition

Peco, through PFMI and LLC, acquired certain assets related to the Canton plant (Canton acquisition) from Marshall Durbin Food Corp. and Marshall Durbin Farms, Inc. (collectively, Marshall Durbin), for $10,500,000. The Canton acquisition was memorialized in an asset purchase agreement dated May 12, 1998. The Canton agreement included a schedule (original Canton allocation schedule) which allocated the purchase price among three assets. More specifically, Peco and Marshall Durbin agreed to allocate the $10,500,000 purchase price among 3 assets "for all purposes (including financial accounting and tax purposes)" in accordance with the original Canton allocation schedule. The

original Canton allocation schedule allocated the purchase price as follows:

|            Asset            |  Purchase Price  |
| --------------------------- | ---------------- |
| Real property               |                  |
|   Land            | $350,000         |
|   Improvements    | 5,100,000        |
| Machinery, equipment,       |                  |
|   furniture, and fixtures | 5,050,000 |
|     Total | 10,500,000     |

The Canton agreement defined the term "Real Property" as "real property, leaseholds and subleaseholds therein, improvements, fixtures, and fittings thereon, and easements, right-of-way, and other appurtenant rights thereto (such as appurtenant rights in and to public streets) associated with a processing plant located in Canton, Mississippi." The term "Equipment" was defined as "tangible personal property (such as machinery, equipment, furniture, automobiles, trucks, tractors, trailers, tools and jigs) used in * * * [the Canton plant]." Peco engaged Terry L. Payne (Ms. T. Payne) of PayneSmall to appraise the Canton plant (Canton appraisal) in connection with the Canton acquisition. The Canton appraisal was dated March 8, 1998. Included in the Canton appraisal were approximately 20 pages that listed more than 300 separate assets. That list generally reported the acquisition date, acquisition cost, cost multiplier, replacement cost, and depreciated value of each of the separately identified assets. Ms. Payne was deceased at the time of trial.

III. Cost Segregation Study

Peco commissioned Moore Stephens Frost, PLC (Moore Stephens), in or around 1999 to perform a segregated cost analysis (cost segregation study) of the Sebastopol and Canton plants. The cost segregation study subdivided the assets acquired by Peco into subcomponents based on the Sebastopol appraisal and the Canton appraisal. The results of that study were documented in at least two schedules (collectively, subsequent allocation schedules) and determined that subdividing the acquired assets into various subcomponents entitled Peco to an additional depreciation expense of $5,258,754 from 1998 through 2002. The cost segregation study was prepared by Jim Strobbe, who was deceased when the trial in this case was held.

IV. Federal Income Tax Reporting of Acquisitions

Peco filed a Form 1120, U.S. Corporation Income Tax Return, for the 1997 taxable year (1997 return). On the 1997 return, Peco depreciated certain assets acquired in the Sebastopol acquisition, including the property described as "Processing Plant [Building]" (Processing Plant Building), as nonresidential real property depreciable by a straight-line method over 39 years.

In December 1999, after the cost segregation study was complete, Peco filed a Form 1120 for the 1998 taxable year (1998 return). Attached to the 1998 return was Form 3115, Application

for Change in Accounting Method.  An attachment to the Form 3115 stated that, pursuant to section 2.01 of an appendix to Rev. Proc. 98-60, 1998-2 C.B. 759, 772, Peco proposed to change its method of accounting to "claim allowable depreciation".  Attached to the Form 3115 was a schedule which proposed adjustments to the depreciation method of 55 assets.  The attachment to the Form 3115 stated that each item of property "that is reclassified from nonresidential real property to an asset class of Revenue Procedure 87-56 that does not explicitly include section 1250 property, is section 1245 property for depreciation purposes." In total, Peco calculated the section 481(a)[3] adjustment arising from the accelerated depreciation method as $2,135,779, which reflects the amount of depreciation that Peco believed should have been deducted for the previous taxable years.

Beginning on the 1998 return, Peco depreciated certain assets acquired in the Sebastopol acquisition over 7-year or 15-year class lives and with a double declining or 150-percent depreciation method.  Peco continued to deduct those assets under this accelerated method of depreciation during the taxable years ended April 1, 2000, and March 31, 2001 (1999 and 2000 taxable years, respectively), and the 2001 taxable year.

---

[3]Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code, and Rule references are to the Tax Court Rules of Practice and Procedure.

Peco also subdivided assets reflected in the original Canton allocation schedule into component parts. In particular, Peco subdivided the asset titled "Real Property: Improvements" into subcomponents and, depending upon the asset, claimed depreciation for those subcomponents on the 1998 return using a 7-year or 15-year recovery period and a double declining or 150-percent depreciation method. For the 1999 through 2001 taxable years, Peco continued to depreciate the subcomponents derived from "Real Property: Improvements" under the same method of depreciation.

V.  Notice of Deficiency and Petition

In a notice of deficiency dated March 7, 2008, respondent determined Federal income tax deficiencies of $120,751, $678,978, and $727,323 for Peco's 1997, 1998, and 2001 taxable years, respectively. The deficiencies are mainly attributable to three adjustments.[4]  First, respondent disallowed section 481(a) adjustments of $458,233 for each of the 1998 and 2001 taxable years. Second, respondent determined depreciation adjustments of $635,517 and $444,978 for the 1998 and 2001 taxable years, respectively. Third, respondent determined decreases of

_____

[4]Respondent also determined an alternative minimum tax adjustment of $238,188 for the 1997 taxable year, a prior year minimum tax adjustment of $253,993 for the 1998 taxable year, and a general business credit of $340,849 for the 2001 taxable year. Additionally, respondent determined adjustments to the 1999 and 2000 taxable years which are not at issue in this case.

$162,222, $998,953, and $1,010,787 in Peco's net operating losses for the 1997, 1998, and 2001 taxable years, respectively.

Respondent based these adjustments on his determination that Peco was not entitled to portions of the section 481(a) adjustments related to the Sebastopol acquisition, including (1) all of the section 481(a) adjustment related to the $3,902,551 of assets described as "Processing Plant Building"; (2) all of the section 481(a) adjustment related to the $64,800 of assets described as "Holding Shed #1"; (3) all of the section 481(a) adjustment related to the $75,395 of assets described as "Holding Shed #2"; and (4) a portion of the section 481(a) adjustment related to the $112,000 of assets described as "Waste Water [Treatment Plant]".  Respondent also based these adjustments on his determination that Peco was not entitled to subdivide the asset described as "Real Property: Improvements" into component parts after acquiring that asset in the Canton acquisition.  Peco petitioned the Court in response to the notice of deficiency.

OPINION

I.  Burden of Proof

Respondent's determinations in the notice of deficiency are presumed correct, and Peco bears the burden of proving those determinations erroneous in order to prevail.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  We need not decide

which party bears the burden of proof because the burden of proof does not affect the result in this case.[5]

II. <u>Binding Effect of the Original Sebastopol and Canton Allocation Schedules</u>

A. <u>Overview</u>

Section 1060 prescribes special allocation rules for determining a transferee's basis and a transferor's gain or loss in an applicable asset acquisition. An applicable asset acquisition is any transfer of assets that constitutes a trade or business and with respect to which the purchaser's basis in such assets is determined wholly by reference to the consideration paid for them. Sec. 1060(c). The Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11323(a), 104 Stat. 1388-464, amended section 1060(a) to provide that where the parties to an

---

[5]Peco argues that the burden should shift to respondent to prove the correctness of his determination because the notice of deficiency is arbitrary and capricious. Barring a written stipulation to the contrary, the venue for an appeal of this case is the Court of Appeals for the Eleventh Circuit. See sec. 7482(b)(1)(B). That court differentiates between unreported income cases and deduction cases in determining when the burden of proof shifts to the Commissioner. See <u>Gatlin v. Commissioner</u>, 754 F.2d 921, 923 (11th Cir. 1985), affg. T.C. Memo. 1982-489; see also <u>Amey & Monge, Inc. v. Commissioner</u>, 808 F.2d 758, 761 (11th Cir. 1987), affg. T.C. Memo. 1984-642. Although the Commissioner bears the burden of proving unreported income once it has been shown his determination was arbitrary and erroneous, where, as here, the case involves incorrect reporting of deductions, the taxpayer bears the burden of proving his or her entitlement to the deductions claimed "At all times". See <u>Gatlin v. Commissioner</u>, <u>supra</u> at 923. Thus, even assuming the notice of deficiency was arbitrary and capricious, the burden remains with Peco to prove its entitlement to the deductions claimed.

applicable asset acquisition agree in writing as to the allocation of any amount of consideration, or as to the fair market value of any of the assets transferred, that agreement is "binding" on the transferee and the transferor unless the Commissioner determines that the allocation (or fair market value) is not appropriate.

The House report accompanying the amendment to section 1060(a) explained that

> a written agreement regarding the allocation of consideration to, or the fair market value of, any of the assets in an applicable asset acquisition will be binding on both parties for tax purposes, unless the parties are able to refute the allocation or valuation under the standards set forth in the Danielson case. The parties are bound only with respect to the allocations or valuations actually provided in the agreement.  * * *
>
>     The committee does not intend to restrict in any way the ability of the [Internal Revenue Service] to challenge the taxpayers' allocation to any asset or to challenge the taxpayers' determination of the fair market value of any asset by any appropriate method, particularly where there is a lack of adverse tax interests between the parties.  [H. Rept. 101-881, at 351 (1990)].

In Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), the Court of Appeals for the Third Circuit ruled that a taxpayer can challenge the tax consequences of a written agreement as construed by the Commissioner "only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake,

undue influence, fraud, duress, etc."  The Court of Appeals for the Eleventh Circuit has expressly adopted the Danielson rule. See Plante v. Commissioner, 168 F.3d 1279, 1280-1281 (11th Cir. 1999), affg. T.C. Memo. 1997-386; Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984).

B.    Parties' Arguments

Respondent asserts that section 1060 and the Danielson rule each bar Peco from modifying the purchase price allocations of the Sebastopol and Canton plants in a manner inconsistent with the original Sebastopol allocation schedule and the original Canton allocation schedule (collectively, original allocation schedules).  Peco contends that neither section 1060 nor Danielson prohibits it from classifying property acquired in the Sebastopol and Canton acquisitions as section 1250 property (i.e., structural components of a building) or section 1245 property (i.e., tangible personal property).  According to Peco, section 1060 and its legislative history are silent as to whether a taxpayer may classify property as section 1250 property or section 1245 property and require only that the purchase price be allocated under the residual method of section 338(b)(5).  Thus, Peco argues that it may redetermine the useful lives of assets received in the Sebastopol acquisition and make an initial determination of the useful lives of assets received in the Canton acquisition.

C.   Application of Principles to Acquisitions

The parties agree that each of the acquisitions is an applicable asset acquisition within the meaning of section 1060, and respondent does not challenge the correctness of the allocations of the original allocation schedules.  Peco, insofar as it seeks to elevate the residual method of section 338(b)(5) over the written allocations, misinterprets the law.

Where the parties to an applicable asset acquisition agree in writing as to the allocation of the consideration or as to the fair market value of any of the assets, that agreement "shall be binding" on both the transferee and the transferor unless the Commissioner determines that the allocation is not appropriate.  Sec. 1060(a).  However, where the parties to an applicable asset acquisition do not agree in writing to allocate any part of the consideration of the acquired assets, the residual method of section 338(b)(5) applies to determine the transferee's basis in, and the transferor's gain or loss from, each of the assets transferred.  See West Covina Motors, Inc. v. Commissioner, T.C. Memo. 2009-291.  Congress' use of the phrase "shall be binding", when viewed in the light of section 1060(a) as a whole, directs that the written agreement supersedes the residual method of purchase price allocation.  The residual method is not relevant in the instant case because, as we find, the Sebastopol agreement and the Canton agreement are each enforceable.

Before we decide the validity of the Sebastopol and Canton agreements, we first address Peco's reliance on United States v. Fort, 638 F.3d 1334 (11th Cir. 2011), to support the argument that the Danielson rule is inapposite this case. The taxpayer in Fort received restricted shares in connection with Cap Gemini's acquisition of Ernst & Young's information-technology consulting business. The taxpayer in Fort was an Ernst & Young partner who received, in addition to other consideration, restricted shares in Cap Gemini in exchange for his partnership interest in Ernst & Young. The terms of the agreement between Cap Gemini and Ernst & Young were detailed in an agreement (master agreement) to which the Ernst & Young partners agreed to be bound. The taxpayer filed his 2000 Federal income tax return reporting the restricted and unrestricted shares as income and amended that return to assert that he did not receive income from the restricted shares during that year. The IRS issued a refund and, after determining that it did so erroneously, sued to recover the refund in the U.S. District Court for the Northern District of Georgia. The District Court granted summary judgment in the Government's favor because the taxpayer constructively (but not actually) received the restricted shares.

On appeal to the Court of Appeals for the Eleventh Circuit, the Government argued that the Danielson rule bound the taxpayer to a provision in the master agreement apparently requiring him

to report the restricted shares as income in 2000.  The Court of Appeals, in rejecting that argument, noted that "Danielson and its progeny recognize that parties may agree to a certain form of a transaction, and that if they do, they face a difficult burden in convincing the court that they did not actually engage in the form that they contracted to engage in."  United States v. Fort, supra at 1337-1338.  The court also stated that "the Danielson rule applies if a taxpayer 'challenge[s] the form of a transaction'".  Id. at 1338 (quoting Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984)).  The Court of Appeals noted that the taxpayer did not argue that the form of the transaction differed from what was written in the master agreement, but that the agreed-upon form had specific tax consequences.  Such an argument, said the court, was outside the scope of the Danielson rule.

Unlike the taxpayer in Fort, Peco did not agree in either the Sebastopol agreement or the Canton agreement to a particular tax consequence.  Instead, Peco agreed to allocate the purchase price among the assets listed on each of the original allocation schedules "for all purposes (including financial accounting and tax purposes)".  In seeking to reallocate the purchase price among assets not listed in the original allocation schedules, Peco seeks to challenge the form of the transaction.  We

therefore read <u>Fort</u> as supporting application of the rule in <u>Danielson</u>, not inhibiting it.

Peco has entered into two written agreements allocating the purchase price of the Sebastopol plant and the Canton plant among the acquired assets. Those allocations are binding upon Peco unless (1) respondent determines that they are not appropriate, see sec. 1060(a), or (2) the agreement is unenforceable under traditional contract formation defenses, see <u>Commissioner v. Danielson</u>, 378 F.2d at 775. Because respondent does not dispute the propriety of the original allocation schedules, we need only decide the enforceability of each agreement.

### 1. Sebastopol Acquisition

Pursuant to the Sebastopol agreement, Peco and Green Acre agreed in writing to allocate the purchase prices of 26 assets between PFMI and LLC in accordance with the original Sebastopol allocation schedule. They did so with the understanding that such an allocation would be used "for all purposes (including financial accounting and tax purposes)". The original Sebastopol allocation schedule allocated, among other assets, $3,802,550 to an asset described as "Processing Plant Building".

Peco contends that the Sebastopol agreement is unenforceable because the term "Processing Plant Building" is ambiguous. As Peco sees it, that term does not reflect Peco's and Green Acre's intention to include within the term special mechanical systems

and assets that qualify as section 1245 property.  Because the Sebastopol agreement has a choice-of-law provision specifying the use of Mississippi law, we apply the law of that State in interpreting the provisions of that contract.

Whether a contract is ambiguous is a question of law, and the subsequent interpretation of the contract is a question of fact.  Wood v. Wood, 35 So. 3d 507, 513 (Miss. 2010).  Under Mississippi law, an ambiguous term or phrase is "'one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of customs, practices, usages and terminology as generally understood in the particular trade or business.'"  Dalton v. Cellular S., Inc., 20 So. 3d 1227, 1232 (Miss. 2009) (quoting Walk-In Med. Ctrs., Inc. v. Brever Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987)).  Contract interpretation requires a three-step inquiry.  First, we look to the express wording of the contract in the light of the entire contract without regard to extrinsic or parol evidence.  Cherokee Ins. Co. v. Babin, 37 So. 3d 45, 48 (Miss. 2010).  This calls for an interpretation of the language in a manner "'which makes sense to an intelligent layman familiar only with the basics of English language.'"  Pursue Energy Corp. v. Perkins, 558 So. 2d 349, 352 (Miss. 1990) (quoting Thornhill v. Sys. Fuels, Inc., 523 So. 2d 983, 1007 (Miss. 1988)).  If the parties'

intent is unclear, we next apply canons of contract construction. Cherokee Ins. Co. v. Babin, supra at 48. If the meaning of a term remains ambiguous, only then may we look to extrinsic evidence to give effect to the ambiguous term. Id.

We reject Peco's contention that the term "Processing Plant Building" is ambiguous. Peco and Green Acre agreed to allocate a portion of the Sebastopol purchase price to an asset described as a "Processing Plant Building" (emphasis added), and not one described simply as "Processing Plant". We conclude that inclusion of the word "building" is significant.

As relevant here, the Merriam Webster's College Dictionary 150 (10th ed. 1997) defines the term "building" as "a [usually] roofed and walled structure built for permanent use". In its second definition, the Merriam Webster's College Dictionary 890 (10th ed. 1997) defines the term "plant" as "the land, buildings, machinery, apparatus, and fixtures employed in carrying on a trade or an industrial business", "the total facilities available for production or service", or "the buildings and other physical equipment of an institution". In the light of these definitions, we believe that Peco and Green Acre would have simply referred to "Processing Plant" rather than "Processing Plant Building" had they intended to include within the term special mechanical systems and other assets that are not part of a building. By including the term "building" (i.e. a structure) to describe the

assets acquired, we believe that Peco and Green Acre intended to allocate a portion of the purchase price to a structure and not to the assets contained therein.

The Sebastopol agreement as a whole also evidences an intent on the part of Peco and Green Acre to specifically assign value to a structure and not to the assets contained therein.  Under the original Sebastopol allocation schedule, Peco and Green Acre agreed to allocate $6,064,760 of the purchase price to machinery, equipment, and furniture, and $3,802,550 to the "Processing Plant Building".  We view Peco's decision to allocate almost twice as much of the purchase price to machinery, equipment, and furniture as to the "Processing Plant Building" as probative of its intent that the original Sebastopol allocation schedule allocated the purchase price among the specific component assets conclusively. The decision to allocate the purchase price among machinery, equipment, and furniture, we believe, also shows that Peco was aware of the specific component assets but chose to not allocate additional purchase price to those assets.

Moreover, Peco acknowledged on brief that it perceived the need to alter the depreciation method of the "Processing Plant Building" following its consultation with Moore Stephens, and our decision in Hosp. Corp. of Am. v. Commissioner, 109 T.C. 21 (1997).  Such an acknowledgment suggests that Peco intended the asset described as "Processing Plant Building" to be treated as a

single asset when it entered into the Sebastopol agreement. The chronology of events suggests that Peco believed that the term "Processing Plant Building" was ambiguous only after it perceived a benefit which could be realized by subdividing the building into component assets. Thus, it is reasonable to conclude that there was not an ambiguity concerning the asset described as "Processing Plant Building" as agreed to by Peco and Green Acre. Because Peco alleges no other defect in the Sebastopol agreement which makes that contract unenforceable, we give effect to that agreement for Federal tax purposes, as Peco agreed to be bound.

On the basis of the foregoing, Peco is bound by the original Sebastopol allocation schedule under section 1060 and Danielson. It follows that Peco must report its income under the method of accounting adopted before the request for change in accounting method. See Capital One Fin. Corp. v. Commissioner, 130 T.C. 147, 155 (2008), affd. 659 F.3d 316 (4th Cir. 2011). We therefore sustain respondent's determination as to the Sebastopol acquisition.

### 2. Canton Acquisition

A similar analysis applies to the Canton acquisition. Under the Canton agreement, Peco and Marshall Durbin agreed in writing to allocate the purchase price of the Canton plant among three assets as provided in the original Canton allocation schedule. They did so with the understanding that the original Canton

allocation schedule would be used "for all purposes (including financial accounting and tax purposes)". The original Canton allocation schedule allocated $5,100,000 to, among other assets, an asset described as "Real Property: Improvements".

Peco asserts that the Canton agreement is not enforceable because the term "Real Property: Improvements" is ambiguous. As with the Sebastopol agreement, Peco contends that the term "Real Property: Improvements" does not reflect the parties' intent to include within that term specialized mechanical systems and other assets that qualify as section 1245 property. We apply Alabama law in construing the provisions of that contract because the Canton agreement contains a choice-of-law provision specifying the use of the law of that State.

Whether a contractual provision is ambiguous is a question of law, and the meaning of that contract is a question of fact. Kelmor, LLC v. Ala. Dynamics, Inc., 20 So. 3d 783, 790 (Ala. 2009) (quoting Ex parte Gardner, 822 So. 2d 1211, 1217 (Ala. 2001)). We discern the intent of the contracting parties from the contract as a whole. Homes of Legend, Inc. v. McCollough, 776 So. 2d 741, 746 (Ala. 2000). We give the terms in a contract their "ordinary, plain, and natural meaning" unless the contract establishes that the terms were intended to be used in a special or technical sense. Id. Where the terms are unambiguous, we presume that the contracting parties intended what they stated

and will enforce the contract as written.  Id.  However, where the terms of the contract are ambiguous, we resolve the ambiguity using established rules of contract construction.  Id.  Where we are faced with competing constructions, one valid and the other invalid, we are bound to accept the construction that will give effect and meaning to the terms of the contract.  Id.  A contractual term is ambiguous where it is "reasonably susceptible of more than one meaning."  FabArc Steel Supply, Inc. v. Composite Constr. Sys., Inc., 914 So. 2d 344, 357 (Ala. 2005).

We conclude that the term "Real Property: Improvements" is unambiguous in the light of the Canton agreement as a whole. Peco and Marshall Durbin agreed to allocate the purchase price of the Canton plant among three assets; namely, "Real Property: Land", "Real Property: Improvements", and "Machinery, Equipment, Furnitures [sic] and Fixtures".  The decision to allocate the purchase price separately among these various assets shows that Peco was aware of the existence of subcomponent assets but chose not to allocate additional purchase price to them.  Had Peco intended to allocate purchase price to subcomponent assets, we believe that it would have done so by allocating additional purchase price to the asset described as "Machinery, Equipment, Furnitures [sic] and Fixtures".  We note that the Canton appraisal was dated before the date on which Peco entered into the Canton agreement.  This chronology suggests that Peco could

have adopted a more detailed allocation schedule into the Canton agreement but did not.

Further, the Canton agreement contained a merger clause that the contract, accompanying exhibits, and closing documents "constitute the entire agreement between the Parties."  The merger clause creates a presumption that the writing represents a "final and complete * * * agreement of the parties."  Ex parte Palm Harbor Homes, Inc., 798 So. 2d 656, 660 (Ala. 2001).  Given the foregoing, we believe it reasonable to conclude that the term "Real Property: Improvements" is not ambiguous.  Because Peco raises no other defect in the Canton agreement, we enforce the contract as written.  Consequently, we hold that the original Canton allocation schedule is binding upon Peco under section 1060 and Danielson.[6]

---

[6]Whereas Peco urges us to look to extrinsic evidence in the form of the Canton appraisal to determine the meaning of the asset described as "Real Property: Improvements", we decline to do so because we conclude that the terms of the Canton agreement are clear and unambiguous.  See, e.g., Gafford v. Kirby, 512 So. 2d 1356, 1363 (Ala. 1987) ("It is well settled in this state that extrinsic evidence is not admissible if the instrument, on its face, is clear and unambiguous."); Martin v. First Natl. Bank of Mobile, 412 So. 2d 250, 253-254 (Ala. 1982) ("the Court will not look beyond 'the four corners of the instrument' unless latent ambiguities exist").  We also consider the Canton appraisal to be unreliable in certain material respects.  Because Ms. T. Payne was not alive at the time of trial, respondent was unable to cross-examine her on the methodologies she used to allocate value among the assets.  Moreover, the Canton appraisal states that Ms. T. Payne used "opinions, data, and statistics" from third parties in drafting the report and thus it contains hearsay within hearsay.

Peco argues that neither section 1060 nor the <u>Danielson</u> rule prohibits it from making an initial determination of the useful lives of assets acquired in the Canton acquisition inconsistent with the original Canton allocation schedule. We disagree. Where a taxpayer's method of accounting does not clearly reflect income, section 446(b) authorizes the Commissioner to compute taxable income under a method which, in his opinion, clearly reflects income. The Commissioner's determination of whether an accounting method clearly reflects income is entitled to "more than the usual presumption of correctness." <u>Ford Motor Co. v. Commissioner</u>, 102 T.C. 87, 91 (1994), affd. 71 F.3d 209 (6th Cir. 1995). The Commissioner's interpretation under the "clear reflection standard" is given wide latitude that courts have been loathe to interfere with "'unless clearly unlawful'". <u>Thor Power Tool Co. v. Commissioner</u>, 439 U.S. 522, 532-533 (1979) (quoting <u>Lucas v. Am. Code Co.</u>, 280 U.S. 445, 449 (1930)); see also <u>Knight-Ridder Newspapers, Inc. v. United States</u>, 743 F.2d 781, 788 (11th Cir. 1984); <u>Ford Motor Co. v. Commissioner</u>, <u>supra</u> at 91. Before we will disturb the Commissioner's determination that a method of accounting does not clearly reflect income, the taxpayer bears the burden of proving that the Commissioner acted arbitrarily, capriciously, or without sound basis in fact. See <u>Knight-Ridder Newspapers v. United States</u>, <u>supra</u> at 788.

We conclude that respondent did not abuse his discretion in prohibiting Peco from determining useful lives of assets in a manner that was inconsistent with the original Canton allocation schedule. In binding Peco to that schedule, respondent ensures that the transferee (Peco) and the transferor (Marshall Durbin) treat the assets consistently for Federal tax purposes. Allowing Peco to treat the acquired assets in a way other than the one in which it agreed to, subjects respondent to a potential whipsaw. Such a whipsaw might occur if, for example, Peco treated certain property as section 1245 property but Marshall Durbin treated that property as section 1250 property. Respondent would be made to treat two parties to the same transaction inconsistently. Even if a danger of whipsaw did not occur, binding Peco to the original Canton allocation schedule prevents it from realizing a better tax consequence than the one it bargained for. See Plante v. Commissioner, 168 F.3d at 1282.

Nor was respondent unreasonable in determining that assets described as "Real Property: Improvements" are nonresidential real property depreciable over 39 years. A building and its structural components are classified as section 1250 property, sec. 1245(a)(3)(B), and nonresidential real property is per se section 1250 property, sec. 168(e)(2)(B). Section 1.1250-1(e)(3), Income Tax Regs., defines real property to include the structural components of a building within the meaning of section

1.1245-3(c), Income Tax Regs., which in turn specifies that the terms "building" and "structural components" have the meanings assigned to those terms in section 1.48-1(e), Income Tax Regs. Section 1.48-1(e), Income Tax Regs., defines the terms "building" and "structural components" as follows:

> (e) Definition of building and structural components.
>
> (1) * * * The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. * * *
>
> (2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as paneling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. * * *

The term "tangible personal property", on the other hand, is defined under section 1.48-1(c), Income Tax Regs., to include "any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures)."

When viewed against the foregoing regulations, respondent's conclusion that assets described as "Real Property: Improvements" are nonresidential real property is not unreasonable.  The Canton agreement defines term "real property" to include, in addition to other assets, "improvements, fixtures and fittings thereon".  We think it reasonable to conclude that assets described as "Real Property: Improvements" are better viewed as nonresidential real property than tangible personal property.  We therefore sustain respondent's determination that the asset described as "Real Property: Improvements" is section 1250 property, depreciable with a straight-line method over a period of 39 years.[7]  See sec. 168(b) and (c).

Peco relies upon our decision in Hosp. Corp. of Am. v. Commissioner, 109 T.C. 21 (1997), as support for its position that it may subdivide the acquired assets into subcomponents for depreciation purposes because some of the subcomponent assets are, in hindsight, more appropriately viewed as section 1245 property than section 1250 property.  As Peco sees it, our decision in Hosp. Corp. of Am. provides the legal basis and the cost segregation study provides the factual basis for subdividing

----

[7]We note that although Rev. Proc. 87-56, 1987-2 C.B. 674, allows for certain "Land Improvements" to be depreciated over a recovery period of 15 or 20 years, that revenue procedure specifically excluded from that category any land improvements that are buildings and structural components as defined in sec. 1.48-1(e), Income Tax Regs.

the component assets. We disagree with Peco that Hosp. Corp. of Am. applies in the manner urged.

The taxpayers in Hosp. Corp. of Am. were members of an affiliated group of corporations that owned, operated, and managed hospitals. The taxpayers claimed depreciation deductions based on 5-year recovery periods for certain property which they claimed constituted tangible personal property (i.e., section 1245 property). The Commissioner determined that the properties were structural components (i.e., section 1250 property) and that they should be depreciated over the same recovery periods as the buildings to which they related. We held that the classification of an asset as section 1245 or section 1250 property is decided under the precedent governing whether property is eligible for the section 48 investment tax credit, and specifically under the definitions in section 1.48-1(c), Income Tax Regs. (defining tangible personal property), and section 1.48-1(e)(2), Income Tax Regs. (defining buildings and structural components).

The dispute in the instant case is far more simplistic than the one presented in Hosp. Corp. of Am. Unlike the taxpayers in Hosp. Corp. of Am., Peco is bound by the clear and unambiguous terms of the original allocation schedules. Thus, whether the acquired assets may be subdivided into component assets is immaterial because Peco may not deviate from its characterization of those assets as stated in the original allocation schedules.

The Court of Appeals in <u>Danielson</u> observed that "'where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences.'" <u>Commissioner v. Danielson</u>, 378 F.2d at 778 (quoting <u>Hamlin's Trust v. Commissioner</u>, 209 F.2d 761, 765 (10th Cir. 1954)); see also <u>Thomas v. Commissioner</u>, 67 Fed. Appx. 582 (11th Cir. 2003) ("changes in the tax code do not meet the <u>Danielson</u> standard warranting unilateral reformation of the agreement."), affg. T.C. Memo. 2002-108. The original allocation schedules are binding upon Peco, and it may not subdivide assets in a manner at odds with those schedules. Accordingly, respondent's determination as to each of the acquisitions is sustained.

III. <u>Conclusion</u>

We have considered all arguments made by the parties, and to the extent not discussed above, we conclude that those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.